PRAELETORIAN DIAMOND OIL ASS'N v.
GARVEY et al. (No. 1801.)

Court of Civil Appeals of Texas. Beaumont.
March 23, 1929.

Rehearing Denied March 27, 1929.

Allan B. Hannay and Fulbright, Crooker & Freeman, all of Houston, for appellant.

Smith, Combs & Matthews, of Liberty, for appellees.

O'QUINN, J. Appellant sued appellees, N. Garvey and Lone Star Gravel Company, to recover for the value of commercial gravel taken out of land, the property of appellee Garvey, which land was under a mineral lease to appellant, and also seeking to re- strain the further taking of gravel from said land.

Appellant alleged that it was an unincorporated joint-stock association, of which Garvey was a member, and that said association was formed for the purpose of securing mineral leases, discovering and producing oil, gas, and other minerals, and marketing same, as well as selling stock in the association; that appellee Garvey was bound by the terms of the association agreement to lease his lands to appellant, and that, in accordance with such agreement, he duly executed and delivered to appellant a lease of his lands for the purpose of exploration, development, and exploitation for oil, gas, and other minerals, including the tract from which the gravel was being taken; that appellant, in pursuance of the terms of said lease, began to drill a well within the time it was obligated so to do, and drilled same to a depth of 4,200 feet, whereby its right to the gravel in question became fixed and vested; that as a result of its said drilling operations it had discovered mineral in paying quantities, to wit, gravel; that appellee Garvey had breached his lease contract with appellant, in that he had leased and let to the appellee Lone Star Gravel Company the mineral rights, in so far as they pertained to gravel in the land in question, contending that gravel was not included in his mineral lease to appellant; that appellee, Lone Star Gravel Company, had taken possession of the tract of land in question and was taking therefrom large quantities of gravel, for which it should account to appellant for its full value, less one-eighth, which under its lease from Garvey should be paid to said Garvey as his royalty under his lease contract with appellant. Appellant also inserted a count in trespass to try title, and prayed for an injunction to restrain appellees from further trespassing upon said land, or removing any of the machinery or improvements it had placed thereon.

Appellees answered by general demurrer, general denial, and specially answered that it was not within the contemplation of appellee Garvey, as lessor, and the Praeletorian Diamond Oil Association, as lessee, that the lease should include gravel or the right to prospect for gravel; that it was the intention of the parties at the time the lease was executed that the clause "all the oil, gas and other minerals" in said lease gave to appellant the right to prospect said land only for such minerals as oil and gas; that in the territory where appellant was to operate it was not generally known or believed that gravel was a mineral, and that the accepted meaning of the term "mineral" excluded gravel, and that it was not contemplated by the parties that gravel was a mineral or that same was included in said lease; that it was manifest from the terms of the lease that gravel

was not intended to be included as a mineral therein, or, at least, that it was uncertain from the language and terms of said lease whether gravel was intended to be embraced as a mineral. Appellees further specially answered that appellant had forfeited its said lease, in that the primary consideration for the lease contract was royalty in the minerals discovered and produced, and that appellant had negligently breached its obligation in the matter of development and had abandoned the premises; that appellant had invited, encouraged, and induced appellee Lone Star Gravel Company to explore and prospect for gravel and sand the land involved, as well as other lands in the vicinity, such other lands then and there being under a similar "oil, gas and other minerals" lease as the land in controversy, thereby inducing appellee Lone Star Gravel Company to believe that appellant did not claim any ownership of or right in or to said gravel, because of which said appellee was induced to and did build a railroad track approximately two miles in length to the land in controversy, at a cost of $20,000, connecting the gravel pits with the railroad track, and to expend other large sums of money in the completion of excavations and pits and the operation of mining the gravel; and that it had gone into possession of the premises and made the large expenditures aforesaid in good faith, without any intimation from appellant that it had or claimed to have any right, claim, or title to said gravel; and by cross-action fully pleaded and prayed for affirmative relief.

The case was tried to the court without a jury, and, when appellant had concluded its evidence, appellees moved for judgment, which was granted, and judgment entered for appellees. This appeal is from that judgment.

At the request of appellant, the court made and filed his findings of fact and conclusions of law. Among other things, the court found:

"Fourth. That on or about the 12th day of August, 1925, the plaintiff, Praletorian Diamond Oil Association, commenced the drilling of a well on lands belonging to one Chas. I. Vick, said well being within about a half mile of the 196 acre tract of land covered in the lease from the defendant, Garvey to said oil association; that drilling was prosecuted on said well intermittently from that time until the 15th day of March, 1927, when all operations ceased, oil and gas not having been discovered. There being no exercise of diligence on the part of plaintiff for the development of the minerals covered by said lease contracts since said date March 15th, 1927.

"Fifth. That the only operations ever carried on by the plaintiff in the prospecting or drilling for oil, gas and other minerals was the drilling of the above mentioned well; that the plaintiff, Praletorian Diamond Oil Association, is without funds, being several hundred dollars in debt, and without any means, so far as disclosed by the evidence, of prosecuting further operations, which conditions have existed since said 15th day of March, 1927, when drilling operations ceased as above mentioned. That the only means which plaintiff has of raising funds is by means of the sale of stock; that the Secretary of State of the State of Texas, has refused a permit for the sale of additional stock in said association.

"Sixth. That on or about the 1st day of September, 1927, the defendant, Lone Star Gravel Company, went upon the 196 acre tract of land described in one of said lease contracts offered in evidence by plaintiff, built a railroad track, erected structures and equipment for the purpose of working, mining and selling gravel and sand from said land, and is still engaged in operations thereon. The deed or contract under which it is operating not being in evidence, the nature of its claim is not disclosed, except that it is operating under some kind of a contract with the defendant, Noble Garvey.

"Seventh. That at the time of the organization of the plaintiff, Praletorian Diamond Oil Association, and at the time its leases, including the lease contracts from Noble Garvey, were secured, the purpose and intention of said association was to prospect for, produce and sell commercial oil and gas; that such was the general understanding of its organizers, as well as all persons who executed oil, gas and mineral leases to it. That it thereafter purchased oil well drilling equipment, and all operations since carried on by it under its said leases were for the purpose of discovering and producing oil and gas. That the organizers and stockholders of said association at no time had any intention of mining and selling sand and gravel, and it was not within the contemplation of the stockholders of said company or those who executed the oil, gas and mineral leases to it, including the Garvey leases, that said leases covered commercial sand and gravel. That in the year 1925, the time of the beginning of operations for drilling an oil well, as above mentioned, plaintiff discovered sand and gravel on the Chas. I. Vick tract where said well was being drilled, that no effort was then made or has since been made to produce and market said sand and gravel either from said Vick tract or elsewhere.

"Eighth. The Court further finds that the moving consideration received by defendant, Noble Garvey, for the execution of the oil, gas, and mineral leases above mentioned to the plaintiff, was the obligation of the plaintiff to drill, prospect for, and produce, if found, oil and gas; that the value of the stock in the plaintiff association was dependent upon the discovery and production by it of oil and gas.

"Ninth. The Court finds that the plaintiff has never at any time gone into possession of any of the lands leased by it from the defendant, Noble Garvey, for the production of sand or gravel, or for any other purpose, and so far as disclosed by the evidence there is nothing to indicate that plaintiff has any present intention, even if it had the means, to enter upon said land for the purpose of producing sand and gravel."

There is also a full statement of facts in the record, duly certified by the court reporter, agreed to by the parties, and approved by the court, which fully sustains the findings of the court. We adopt same as our findings, together with such other findings as we shall state in discussing the propositions presented.

The conveying clause in the lease from Garvey to appellant reads: "That the lessor, for and in consideration of the sum of one dollar to me in hand paid, together with other good and valuable considerations hereunto moving, the receipt of which is hereby acknowledged, I hereby demise, lease and grant unto said lessee and its assigns, all the oil, gas, and other minerals in and under the hereinafter described tract of land; and the exclusive right to prospect and operate thereon for oil, gas and other minerals, together with the right of way, right to lay pipe lines over and upon, to use water, gas and oil to operate said property, taken from said premises, to erect derricks, to build tanks, and to place all necessary machinery or structures on said premises, and to remove all property at any time that may be placed on said land during the term of this lease."

The lease further provides: "And it is further agreed that the lessee, in consideration of this lease, shall deliver free of cost to the lessor in pipe lines or tanks one eighth of all the oil or other minerals, produced, saved and sold from the above described premises."

■■ Appellant's first proposition is to the effect that the lease from Garvey to it included all minerals for which the land could be profitably worked, and hence included commercial gravel. In its brief it says: "The question to be determined is whether or not the language 'all the oil, gas and other minerals in and under' the particular described tract of land is broad enough to cover commercial gravel."

We do not think that the abstract question of whether or not gravel is a mineral is necessary to be determined. As we view it, the question is whether, if it be conceded that gravel is a mineral, it was the intention of the parties to convey same in the lease. Appellees plead and here insist that it was not within the contemplation of, and was not the intention of, the parties that gravel was included in the lease contract. The intention of the parties as to what was being conveyed in the lease must be gathered from the four corners of the instrument. All the provisions of the instrument must be considered. We think it evident, when the instrument as a whole is considered, that it was not the intention to convey gravel. While it is true that the lease recites that "all the oil, gas and other minerals" are conveyed, still it is manifest from the other provisions that gravel was not included. The lease provides that appellant shall have the right to "erect derricks," "build tanks," and "lay pipe lines" on the land in operating for minerals. These constitute the well-known and commonly understood instrumentalities and method for the sinking of and operating oil wells and caring for the production of oil, but they are in no wise appropriate for the mining of gravel. The lease has no provisions for the mining of gravel, nor the caring for or disposition of gravel. Furthermore, the lease provides that the lessor's compensation is to be one-eighth of all the oil or other minerals produced, saved, and sold from the premises, and that the lessee, appellant, shall deliver free of cost to the lessor said one-eighth royalty of all oil or other minerals in pipe lines or tanks, etc. We do not think it could be seriously contended that it was the intention of the parties or within the contemplation of the parties that one-eighth of the gravel produced from said land should be delivered in pipe lines and tanks. We think it is perfectly clear from the face of the lease that only such minerals—oil and gas—as could be and are customarily stored in tanks or transported in pipe lines were contemplated by the parties and intended to be included in the conveyance in the lease.

■■ However, if we are mistaken in saying that the lease is clear and unambiguous in its terms, and that upon the face of the instrument it excludes gravel as a mineral conveyed, and it be that the terms of the lease are ambiguous, then resort must be had to extraneous evidence to aid in arriving at the intention of the parties. All the evidence offered was by appellant. In the articles of agreement of appellant it is stated: "The general nature of the business to be transacted is to secure leases and produce oil, gas and other minerals and to sell same and to sell stock for the association." And: "The leases from the general partners herein are the same as other leases, that is, a one-eighth royalty is reserved to the party making the lease and seven-eighths goes to the association."

Frank Zimmerman, promoter and organizer of appellant, testified:

"I was one of them to bring the first idea that we would try for oil there, and then I got connected with the gentlemen and they helped me to put this thing in a company to drill for oil. I promoted this oil company. I was doing most of the work. I am the fellow that conceived the idea that it was oil

bearing territory; and, having that idea, I put it before the people who later became parties to these articles of agreement, and they were interested to the extent that they went with me.

"The purpose of the company was to operate for oil, gas and other minerals. We bought the machinery for the purpose of operating for oil. We organized that company for the purpose of operating for oil. That was the argument I made to the people I was trying to interest in this proposition.

"This well we drilled was on the Charles Vick tract. The well was not on any of the land involved in this suit. It was about half a mile from the 196 acre Garvey tract, where the Lone Star Gravel Company is now operating.

"We did discover gravel on the Charles Vick tract. When we drilled a water well for use in the operations for drilling an oil well we found gravel; and then we had that gravel up on top, and brought some of it to town, and they asked where we got that gravel, and we told them we got it by drilling a water well. And they came and asked if they could prospect for gravel around there, and came in the office. We did not make any written agreement at all. We said to go ahead and prospect. We told them they could go ahead and prospect.

"We drilled that oil well in 1925. We found the gravel there before we operated for oil. That was some time in 1925. The oil company did not do anything to operate for gravel on the Charles Vick tract. They did not do anything toward operating that land for gravel. We have not done that because we were after oil, and we did not have any finances even to drill deeper. We of course were not financially able to operate a gravel pit over there.

"We do not know yet whether we are financially able to operate there or not. Our financial condition is $400.00 in the hole. I do not know whether it would cost at least $100,000.00 to properly start to develop a gravel pit over there or not, but that is what they claim. I am one of the plaintiffs in this suit, and that is our allegation, that it will take $100,000.00 to build railroad tracks into the land and place the necessary equipment there to produce gravel. That is the reason we did not operate on the Charles Vick tract for gravel. We did not start there for the gravel.

"It was not the purpose of the company in the beginning to operate for gravel. It was not the purpose of the company, to begin with, to operate for gravel. It was not my purpose, or the purpose of any official of the company, at the time we raised this money to drill this oil well to spend any of that money raised in operating for gravel. That was not our purpose at that time. It was never mentioned when we organized. When these leases were signed they covered the oil and gas and all the minerals. We did not go in for the purpose of getting gravel in there. If we had we would have bought gravel equipment. When we organized the company and entered into these Articles of Agreement, and at the time Mr. Garvey signed these leases, it was not the intention of the company to operate for gravel; but it was the intention to get any kind of minerals we could.

"We quit drilling there in 1926, on the fifteenth day of March. No, it was 1927, since we quit drilling.

"Nobody has operated for gravel on the Charles I. Vick tract. Mr. Garvey or nobody else has refused to permit us to operate for gravel on this land covered by the Garvey leases, because nobody tried to get the gravel. My company did not decide that they wanted to operate for gravel. I cannot tell yet whether my company wants to operate for gravel. I can get out and maybe raise the money for gravel. I know I could get out and raise the money for gravel just like I was going to raise money for oil and gas. * * *

"I did not tell any of them that if we did not find oil we might find some gravel. I did not even mention gravel. I did not understand that gravel was a mineral. I do not know yet if it is a mineral. Our sole and only purpose to begin with was to operate for oil.

"We had a geologist, an oil expert, go up there and look that country over. We had him looking for oil, and that is all we had him looking for. * * *

"I never heard of the term 'one-eighth royalty' in connection with gravel. I never heard of one-eighth of the gravel being delivered in the pipe line, or being delivered to the grantor in tanks."

O. N. Smith, a member of, and the attorney for, appellant, who prepared the lease in question, testified, among other things:

"So far as concerns me personally, it was not in contemplation when these lease contracts were executed that the word 'mineral' should embrace gravel. * * * I made no effort to interest any official of the Lone Star Gravel Company to operate for gravel. I do not think I even went out there. I knew by hearsay that they were going to try to operate for gravel. I suppose the officials of my company knew that the Loan Star Gravel Company was going over there. My company did not object, as a company, to them going over there. We stood by, knowing they were going over there and spending large sums of money for the purpose of opening up a gravel mine. I made no complaint or claim to any of the officials of the Lone Star Gravel Company that my company was claiming the gravel under the land. My company did not make any such complaint or claim."

We think it is plain that appellant associa-

tion was organized for the sole purpose of prospecting for and developing oil production, and that the lease in question was not taken for the purpose of prospecting for gravel then or at any time. This is made too clear for disputation by the very terms of the lease, as well as the testimony of those who promoted and conducted appellant. It is nowhere stated by any of the witnesses that mining gravel was contemplated, or that it was intended to include gravel in the lease contract, or that there was ever any contemplation on the part of appellant to mine gravel. It will be observed that the provisions in the lease for compensation to be received by the lessor, the amount and the method of its payment, is that commonly employed in oil prospecting contracts. Zimmerman testified frankly that it was not the purpose of the association to operate for "gravel"; that no such purpose ever existed at any time. He says: "We did not go in for the purpose of getting gravel in there. If we had we would have bought gravel equipment; and that at the time Garvey executed the lease it was not the intention of the association to operate for gravel." So we find that it was not the intention of the parties to the lease at the time of its execution to include gravel as a mineral, and that same was not included.

What we have said renders it unnecessary to determine the other questions presented. The judgment should be affirmed, and it is so ordered.

Affirmed.