UNITED STATES SMELTING, REFINING AND MINING COMPANY, a Delaware corporation; UV Industries, Inc., a Maine corporation; R.L. Hamann, and if deceased, his unknown heirs; Barbara J. Underwood, and if deceased, her unknown heirs; Gary Earl Thompson, and if deceased, his unknown heirs; Stella G. Gilbert, and if deceased, her unknown heirs; Marjorie J. Webb, and if deceased, her unknown heirs; Lucille Thompson, and if deceased, her unknown heirs; Edward A. Thompson, and if deceased, his unknown heirs; Lee Jesson, and if deceased, his unknown heirs; R.L. Hamann, as trustee for Eileen Jesson; Eileen Jesson, and if deceased, her unknown heirs, Appellants/Cross-Appellees,

v.

Walter WIGGER, Appellee/Cross-Appellant.

Nos. 7403, 7404.

Supreme Court of Alaska.

May 25, 1984.

J.P. Tangen, Pamela L. Finley, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellants/cross-appellees.

Barry Donnellan, Donnellan Law Office, Fairbanks, for appellee/cross-appellant.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal arises out of a summary judgment in favor of Walter Wigger against United States Smelting, Refining and Mining Co., UV Industries, Inc., Alaska Gold Co. and the Jesson heirs. On March 1, 1933, Clara and L.N. Jesson executed a mineral lease to Fairbanks Exploration Co. (hereinafter F.E. Co.). United States Smelting, Refining and Mining Co., UV Industries, Inc. and Alaska Gold are successors in interest to F.E. Co. Alaska Gold is the current lessee. The original lessors' interest passed to their descendants, collectively referred to as the "Jesson heirs."

The lease concerned mining properties owned by the lessors situated in the area of Ester Creek and its tributaries in the Fairbanks Mining and Recording District. The lease provided that rent be paid in the form of royalties. The lease was to "continue until all gold and other precious metals and minerals recoverable in the sole opinion of the Lessee at a profit shall have been recovered from the demised premises or from any claim on Ester Creek or its tributaries which the Lessee may be mining...."

The properties were mined for gold from the mid-1930s to 1964. Mining operations for gold were suspended in 1964 because mining costs made it uneconomical to continue operations. However, in 1968, Alaska Gold's predecessor paid royalties to the heirs on tailings which had been condemned by the State for highway construction purposes. In 1972, Wigger asked the Jesson heirs to sell their interests in the mining properties for $100 per acre. He stated in letters to them that he was interested in buying the land because he wanted to construct a settling basin for other mining operations. He further wrote to the heirs that he was aware that they were reluctant to sell unless they could continue to receive royalties under the lease.

Most of the Jesson heirs deeded their property to Wigger; he obtained about $17/20$ of the Jesson property. Each deed contained a reservation stating that the heirs would continue to receive the same royalties provided in the lease if and when gold was mined.[1]

In September, 1972, two months after receiving all the deeds, Wigger wrote the current lessee requesting that the lease be terminated because the "claims have not been mined since 1963." On November 18, 1974 Wigger mailed a lease termination notice to UV Industries on the grounds that the tailing, "gravel," had been removed by the lessee without payment to Wigger. In August, 1980, Wigger filed a complaint against Alaska Gold and its predecessors seeking to have the lease declared null and void and to quiet his title to the real property free and clear of all claims of the defendants. Wigger alleged that the lease was terminated (1) because the lease had terminated on its own terms or (2) because the lessees had abandoned the leasehold.

In September, 1981, Wigger added a cause of action for tortious interference with his contract to sell gravel. After the commencement of the litigation, Wigger contracted to sell to Gareth Wright 27,000 cubic yards of gravel from the mining claims. Before Wright actually purchased the gravel, he was informed by the lessee, Alaska Gold Co., that it would seek to enjoin him from purchasing from Wigger. Wright reneged on the contract with Wigger and purchased gravel from Alaska

---

1. Each deed contained one of two provisions:
   In the event that the F.E. Co. resumes mining operations on the claims noted in this Deed, the proportionate share of Royalty from Gold production of the interest of ... will be paid to [her/him] in accordance to the Lease between Clara Jesson and L.N. Jesson and the F.E. Co. dated 1st of March 1933 and recorded in the Fairbanks Recording Office as instrument # 71038.
   or
   If or when the F.E. Co. ever mines the above mineral surveys, any Royalty due from the production of gold on this property by the F.E. Co., the proportionate share of this undivided interest will be paid to ...

Gold, which owned other gravel locations and which Wigger claims is the only other major owner of gravel in the Ester Creek area.

Also, after the suit was filed, the corporate defendants moved to dismiss for failure to join indispensable parties, the Jesson heirs. Wigger admitted that the heirs were indispensable parties and amended his complaint. However, three heirs were never served.

The trial court granted summary judgment for Wigger on two alternate grounds: (1) that the lease had terminated in 1964 under its own terms and (2) that the lease had terminated by virtue of abandonment. The trial court granted summary judgment against all defendants, even those unserved. The lower court stated that all defendant heirs were represented by the law firm of Robertson, Monagle, Eastaugh & Bradley, and that they were therefore bound by its holding that the lease had terminated. In regard to the cause of action that Alaska Gold tortiously interfered with a contractual relation, summary judgment was granted in favor of Alaska Gold.

On appeal, the appellants argue that there are genuine issues of fact that should have precluded summary judgment in favor of Wigger. They assert that if the court had properly construed the lease, it would not have found that the lease had terminated by its terms or that the lessees had abandoned the lease. They further contend that the doctrines of commercial frustration and equitable estoppel, which were raised below, should have prevented summary judgment. Lastly, they argue that the case should have been dismissed because three indispensable defendants were never served.

Wigger cross-appealed. He states that summary judgment for Alaska Gold on the cause of action for tortious interference with contract was improper.

## I. CONSTRUCTION OF THE LEASE

### A. *Is Gravel Considered a Substance to be Mined Under the Lease?*

The appellants assert that the lease continues until the lessee finds the leasehold to be unprofitable. They assert that through the years the lessees have found the mineral leasehold to be profitable because gravel has been mined by the lessees since 1964 from the demised properties as well as from the lessees' other claims in the Ester Creek area.

The question whether the parties intended gravel to be a mineral under a lease has arisen in other jurisdictions. In *Praeletorian Diamond Oil Ass'n v. Garvey*, 15 S.W.2d 698, 700 (Tex.Civ.App.1929), the court had to decide whether a lease of "all the oil and gas and other minerals in and under" the land was broad enough to include commercial gravel. The court stated that:

We do not think that the abstract question of whether or not gravel is a mineral is necessary to be determined. As we view it, the question is whether, if it be conceded that gravel is a mineral, it was the intention of the parties to convey same in the lease.... We think it evident, when the instrument as a whole is considered, that it was not the intention to convey gravel. While it is true that the lease recites that "all the oil, gas and other minerals" are conveyed, still it is manifest from the other provisions that gravel was not included. The lease provides that appellant shall have the right to "erect derricks," "build tanks," and "lay pipe lines" on the land in operating for minerals. These constitute the well-known and commonly understood instrumentalities and method for the sinking of and operating oil wells and caring for the production of oil, but they are in no wise appropriate for the mining of gravel. The lease has no provisions for the mining of gravel, nor the caring for or disposition of gravel.

*Id.* See also *Kinder v. LaSalle County Carbon Co.*, 310 Ill. 126, 141 N.E. 537 (1923) and Annot. 86 A.L.R. 983, 985 (1933).

Paragraphs 2, 3 and 14 of the lease answer the question whether mining of gravel was contemplated by the parties to be within the lease.

2. TERM OF LEASE:

This lease shall commence on March 1st, 1933, and continue until all *gold and other precious metals and minerals* recoverable in the sole opinion of the Lessee at a profit shall have been recovered from the demised premises or from any claim on Ester Creek *or* its tributaries which the Lessee may be mining, unless this lease shall have been sooner terminated as hereinafter provided.

3. ROYALTY:

As rental for the demised premises the Lessee shall make payment to the Lessor as follows:

From recoveries of *gold and other precious metals* therefrom an amount equivalent to eight per cent (8%) of the net returns (that is to say, gross value, less cost of assaying, insurance and express to the United States Sub-Treasury at Seattle, or bank charges, if bank charges shall be deducted, such charges shall be inclusive of the cost of assaying, insurance and express)....

14. DUMPING RIGHTS....

The Lessee may deposit *tailings* from the demised or other premises on the demised premises. The Lessee may deposit *silt* and *debris* from stripping the demised premises....

(Emphasis added).

■ After examining these provisions, we conclude that the parties did not intend that gravel was to be mined under the lease. First, royalties were to be paid only on "gold and other precious metals." Gravel is not a precious metal. Also, the paragraph on royalties refers to "assaying," "insurance," and "express to the United States Sub-Treasury." Gravel is not assayed or insured or sent to the United States Sub-Treasury. In addition, paragraph 14 further refers to dumping rights; it is reasonable to conclude that the parties assumed that gravel was synonymous with "tailings" and "silt" and "debris."

*Farrell v. Sayre,* 129 Colo. 368, 270 P.2d 190 (1954) also addressed this issue. There the court stated:

that in deciding whether or not in a particular case exceptional substances are 'minerals' the true test is what that word means in the vernacular of the mining world, the commercial world and landowners *at the time of the grant,* and whether the particular substance was so regarded as a mineral ....

*Id.* at 192–193 (emphasis added).

There is no evidence that gravel in this area was a "mineral" to the commercial world or the landowners when the lease was made. In fact, there was no evidence presented that there was commercial mining of gravel by the lessees any time before the 1960s, over 30 years after the lease was entered into.

Thus, because the royalty provision calls for the mining of only gold and precious metals and because gravel did not have commercial value to the contracting parties when they entered the lease, we conclude that the mineral lease does not include gravel.

B. *What Did the Original Contracting Parties Mean by "Sole Opinion" and "At a Profit" in Paragraph 2?*

Appellants argue that even if the mining of gravel had not been included in the lease, and even if gold mining had temporarily ceased, the leasehold would not be terminated. They assert that according to paragraph 2 it is the lessee who has the sole discretion to decide when the leasehold is no longer profitable. Thus they argue that only the lessee can terminate the lease on the basis of non-profitability. They assert that the lessees still consider the leasehold to be profitable.

The issue here is whether the phrase "sole opinion" is to be interpreted on a subjective standard (what the lessee believes to be profitable), or on an objective standard (what a reasonable mining lessee would conclude to be profitable).

*Pape v. Hughes,* 398 Pa. 436, 158 A.2d 547 (1960) is applicable to the issue. In *Pape,* the lessor (plaintiff) granted to Hess a mining lease for a period of five years " 'and for such additional longer period as

the hereinbefore mentioned minerals and materials may be found on the premises ... in sufficient quantity as to be profitable commercially to remove, the *duration of said extended period to be determined by the' grantee 'for the purpose of mining ... said minerals and materials deemed useful and/or marketable by the' grantee.*" *Id.* at 548 (emphasis added). In that case, the lessees (defendants) argued that they had *sole discretion* in deciding whether a mineral was marketable. The court stated that:

> Defendants argue that the words in the lease "deemed useful and/or marketable" indicate that the merchantability of any minerals, if discovered, was *solely to be determined by the lessees.* We read no such meaning in the term clause of the lease. Any such interpretation would lead only *to a ridiculous and an unreasonable* situation. If this reasoning were followed through to its logical conclusion, the mere discovery of a mineral on the premises would, without more, extend the lease indefinitely (*or until the lessees decided otherwise*), regardless of the fact that the mineral found could not be mined and removed profitably. This was clearly not the intention of the parties to the contract and a study thereof in its entirety clearly so indicates.

*Id.* at 550 (emphasis added).

■ In the instant case, although the lease states that the lessee shall determine if the mining of the demised lands or of the lessee's other claims in the Ester Creek area is profitable, an unreasonable interpretation would be that the lessor would enter into a contract where the lessee could act without good business judgment. Thus, since we assume that the lessor expected to make a profit when he entered into the lease and expected that the lessee would act with reasonable business judgment, we conclude that the business judgment of the reasonable mining company should be applied, rather than the arbitrary judgment of the lessee.

The next issue that we must address is when would a reasonable miner consider a mine to be no longer profitable. *Grier v. Eagle-Cherokee Coal Mining Company,* 181 Kan. 567, 313 P.2d 731 (1957) provides us with insight in determining when contracting parties consider a mine no longer profitable. In that case, the court interpreted the provisions of a lease which provided that (1) the term of lease was "five years or until all the merchantable coal, *which can be practically and profitably mined and removed* shall have been mined and removed," and (2) the lessee is obligated to remove *"only such merchantable coal as can be stripped and removed by lessee at a fair and reasonable profit to the lessee."* *Id.* at 737 (emphasis added). The court stated that

> [t]he fair import of these provisions in economic terms is that the lessee is obligated under the lease to mine only such coal as results in a profit to the lessee in terms of dollars and cents. This means that the gross income must exceed the gross expenses from such mining operations.

*Id.*

There is substantial evidence to show that after 1964 Alaska Gold found the mining of gold unprofitable in the leased area. In their response to Wigger's request for admissions, appellants admit that Alaska Gold had no plan to conduct mining operations on the mining claims from 1964 to 1981. Also, the lessees admitted that in various statements from annual reports to stockholders they stated that mining had ceased because it was not economical to continue mining because of the increased cost of labor and the fixed price of gold. Appellants raise no genuine issue of fact to show otherwise.

Appellants argue that paragraphs 4 and 14 state that the lessee did not have to mine the leased properties and that therefore the failure to mine should not be evidence that the lessee felt the mines were not profitable. It is true that paragraphs 4 and 14 give a great deal of discretion to the lessee; but from our reading of the lease,

paragraph 2 is the controlling paragraph here.[2] Paragraph 4 states in pertinent part that:

> Any and all mining operations conducted on the demised premises by the Lessee shall be carried on in a minerlike manner, and at all times shall be under its sole control, and at its discretion, both as to method, manner and place of operation, and also as to time, *except as provided in and by Article 2.*

(Emphasis added).

Thus, we conclude that under paragraph 4 the lessee has discretion regarding when and where to mine, but the lease is always subject to termination if mining becomes unprofitable.

Paragraph 14 relates to *dumping rights.*[3] At the bottom of that paragraph, it states that "The Lessee is in no way bound to mine any of the demised property and shall be the sole judge as to method,

manner, time and place of operation." This statement seems out of place since it appears to apply to mining in general on the leased premises rather than the specific subject of dumping rights. The statement does not, however, differ in substance from the last sentence in paragraph 4 of the lease, note 2 *supra,* except that the statement does not contain the qualification that decisions concerning the time of mining are subject to paragraph 2 of the lease. We do not regard this difference as significant. At best the quoted statement in paragraph 14 leaves open the question whether decisions as to the time of mining are subject to paragraph 2. However, that question is specifically answered in paragraph 4, and the answer given there is controlling.

In conclusion, we hold that the lease terminated in 1964 when the lessee ceased mining in the leased land and in the Ester Creek area because, on an objective stan-

---

2. Paragraphs 2 and 4 read:
   2. TERM OF LEASE:
   This lease shall commence on March 1st, 1933, and continue until all *gold and other precious metals and minerals* recoverable in the sole opinion of the Lessee at a profit shall have been recovered from the demised premises or from any claim on Ester Creek *or* its tributaries which the Lessee may be mining, unless this lease shall have been sooner terminated as hereinafter provided.
   . . . .
   4. LESSEE'S POSSESSION AND MINING RIGHTS:
   Forthwith upon the execution of these presents the Lessor will, and hereby does, deliver unto the Lessee full possession of all and singular the above mentioned placer mining claims and tenements, hereditaments, appurtenances, water rights, ditches and ditch rights thereunto belonging and appertaining; and, subject to the obligation to pay royalties and to the other terms and conditions of this lease, the Lessee shall have the right, so long as this lease shall be and remain in effect, freely to use and mine the said properties, and to extract therefrom all gold and other precious metals and minerals, and appropriate the same to its own use. Any and all mining operations conducted on the demised premises by the Lessee shall be carried on in a minerlike manner, and at all times shall be under its *sole control,* and at its discretion, both as to method, manner and place of operation, and also as to *time, except as provided in and by Article 2.*
   (Emphasis added).

3. Paragraph 14 states:
   14. DUMPING RIGHTS:
   The property covered by this lease is only a part of Ester Creek and its tributaries (NWR L.N.J.C.J. FLO NP) and the Lessee contemplates that it may handle as one operation other properties on Ester Creek and its tributaries (NWR L.N.J.C.J. FLO NP) together with the demised properties. The Lessee may at times carry on operations on the demised premises and at the same or other times on other premises on Ester Creek and its tributaries (NWR L.N.J.C.J. FLO NP). The Lessee may deposit tailings from the demised or other premises on the demised premises. The Lessee may deposit *silt and debris* from stripping the demised premises or other premises along the creek or drains and in the shafts and workings of the demised premises and the Lessee shall have the right to construct, maintain, operate, move and remove any drains, ditches, pipe lines, roads, power lines, pumping plants, dead men, houses, camps or any other property or facilities on the demised premises, as it may require in order to operate the demised property, or any other property, on said Ester Creek and its tributaries.
   The Lessee *is in no way bound to mine* any of the demised property and shall be the *sole judge as to method, manner time and place of operation.*
   (Emphasis added).

dard, precious metals could no longer be profitably mined. Appellants have raised no genuine issue of fact to show that mining was profitable in 1964 or that any mining of gold or precious metals occurred in the demised land or in any claims mined by the lessees in the Ester Creek area since 1964.

Because we have concluded that the lease terminated by its own terms, and abandonment was only an alternate ground for termination, we do not have to decide whether the leasehold was abandoned.

## II. DOCTRINE OF COMMERCIAL FRUSTRATION

Appellants next argue that summary judgment was improper because the lessees were commercially frustrated due to the fact that the government prevented the price of gold from rising while the costs of recovery had risen over the years. Appellants assert that, under Alaska law, unanticipated circumstances, which make a party's performance commercially unfeasible within the financial parameters of the contract, will excuse performance. Appellants cite to *Northern Corporation v. Chugach Electric Ass'n,* 518 P.2d 76 (Alaska 1974) *modified on rehearing,* 523 P.2d 1243 (Alaska 1974). Appellants recognize that impossibility or frustration of contract generally discharges the contract, but they argue that "a temporary impossibility or commercial frustration only delays performance" and that "cancellation of the contract is not appropriate where the frustration is temporary."

■ Appellants' argument fails for two reasons. First, this argument is inconsistent with paragraph 2 of the lease, which *expressly* states that the lease terminates when the lessee finds mining no longer profitable. The intentions of the original parties will be defeated if appellants-lessees could prevent termination because mining has become unprofitable and then continue mining once it becomes profitable again.

■ Secondly, commercial frustration is no defense if the event was foreseeable.

The elements of the doctrine of frustration of purpose are set forth in the Restatement (Second) of Contracts § 265 and in Comment A thereto. The party seeking to avoid the obligations in the contract ... on grounds of frustration of purpose must show total, or near total, destruction of the essential purpose of the transaction. Restatement (Second) of Contracts § 265, Comment A explains that "the frustration must be so severe that it is not fairly to be regarded as within the *risks* that [he] assumed under the contract.

*Beals, v. Tri-B Associates,* 644 P.2d 78, 80–81 (Colo.App.1982) (emphasis added; citations omitted). Further,

[f]rustration is no defense if it was foreseeable.... If the event is foreseeable, there should be provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk is assumed.

14 Cal.Jur.3d *Contracts* § 286 (1954).

In the case at bar, appellants have failed to show that they did not assume the risks, namely the risks that the government would continue to freeze the price of gold at $35.00 per ounce and that the price of labor would rise. At the time of contracting the original parties knew that the government regulated the price of gold then and they assumed the risk that the government would continue to do so. They further assumed the risk that labor costs would rise.

## III. SHOULD WIGGER BE ESTOPPED FROM ASSERTING HIS CAUSE OF ACTION?

Appellants argue that the inequitable actions by Wigger should have resulted in a summary judgment in favor of appellants or at least should have precluded summary judgment in favor of Wigger. Specifically, appellants assert that equitable estoppel and quasi-estoppel should have prevented Wigger from asserting his claim. Appellants state that (1) in return for the convey-

ance, Wigger agreed that the Jesson heirs would retain the right to receive royalties for their individual portion of the estate of the lease; (2) the Jesson heirs were otherwise reluctant to sell their interests; (3) they would not have sold or would have sold for more money if they had known that Wigger would try to have the lease cancelled; and (4) only two months after receiving the property from the last of the heirs, Wigger contacted the lessee to cancel the lease. Appellants argue that these actions meet the standard for equitable estoppel and quasi-estoppel.

■ Appellants' argument again must fail. "The general elements required for the application of equitable estoppel are the assertion of a position by conduct or words, reasonable reliance thereon by another party, and resulting prejudice." *Jamison v. Consolidated Utilities*, 576 P.2d 97, 102 (Alaska 1978).

In regard to the quasi-estoppel argument, we have noted that:

Quasi-estoppel differs from other forms of estoppel in that it appeals to the conscience of the court to prevent injustice by precluding a party from asserting a right inconsistent with a position previously taken by him, and does not require ignorance or reliance as essential elements. It is necessary, however, that any representation made to the party claiming quasi-estoppel must have been based with full knowledge of the facts.

*Id.* at 102. (Citations omitted).

In Wigger's 1972 letter to the lessee he wrote:

I wish to advise you that I own an undivided $^{17}/_{20}$ interest in the claims embraced in that certain lease of March 1st, 1933 between Clara Jesson and L.N. Jesson, as Lessors, and Fairbanks Exploration Company as Lessee.

The intent of the lease, as I understand it, was for Fairbanks Exploration Company to mine the property for "gold and other precious minerals" in order that the owners could share in the profits of the operation through royalties.

I am advised that the claims have not been mined since 1963. The removal and sale of tailings, an operation which I understand has been conducted, is neither contemplated or authorized by the lease. I know of no intention on the part of Fairbanks Exploration to resume mining for gold.

It is requested, under the circumstances, that the lease be terminated.

I would be pleased to meet with your representatives at your earliest convenience to resolve any problems arising from such termination, or any renegotiation of the terms and conditions thereof which could be mutually agreeable.

The mining lease had already terminated by its terms in 1964. The Jesson heirs had the right to terminate the lease then, as did Wigger when he purchased the property in 1972. No royalties from the mining of gold or other precious metals had been paid to the Jesson heirs since 1963. None were promised or expected by the Jesson heirs from Wigger in 1972, or from the lessee Alaska Gold, who admitted it had no plan to conduct mining operations on these claims from 1964–1981. Thus, there was no foreseeable loss of royalties.

The Jesson heirs conveyed to Wigger all their rights in the mining claims except those specifically reserved, i.e. a proportionate share of royalty from gold production under the lease with the F.E. Co.[4] There was no evidence that the heirs could have received a higher sales price without the royalty reservation when Wigger bought the mining claims. Under the reservation clauses in the deeds to the individual heirs, Wigger never agreed to continue the 1933 mining lease, but agreed only to payment to the Jesson heirs of unaccrued royalties in the future "[i]f or when F.E. Co. ever mines."

■ In his September 1972 letter to Alaska Gold, Wigger only *requested* that the lease be terminated or, in the alterna-

4. *See* n. 1 *supra*.

tive, that he and Alaska Gold renegotiate terms and conditions of a lease acceptable to all parties. Alaska Gold *refused* to bargain. Thereafter, a lease termination notice was sent in 1974 and Wigger brought suit to quiet title in August 1980. No action was ever taken or any claims ever made by the Jesson heirs against Wigger until 1981 when the lessees moved that the heirs be added as indispensable parties to the lawsuit quieting title. We conclude from these undisputed facts that the appellants have failed to raise any material issue of fact that could establish any reasonable reliance, prejudice or inconsistent positions resulting from any conduct or words between Wigger and the Jesson heirs. As the vendee-lessor, Wigger then had the right to terminate the lease pursuant to the terms of the lease. *State of Maine v. Fin and Feathers Club,* 316 A.2d 351, 354 (Me. 1974).[5]

## IV. DID THE SUPERIOR COURT ERR IN GRANTING SUMMARY JUDGMENT WHEN THE INDISPENSABLE PARTIES HAD NOT BEEN SERVED WITH PROCESS?

Wigger concedes that three indispensable parties (three of the Jesson heirs) were never served with process; however, Wigger argues that the three unserved heirs "submitted to the jurisdiction of the court below." Appellee bases this argument on the fact that two of the unserved heirs participated below by filing affidavits. He also argues that these three unserved heirs submitted to the court's jurisdiction because "[t]ime and again, [the law firm of Robertson, Monagle, Eastaugh & Bradley] stated to the court either in writing or orally that [it] represented all the defendants."

■ In *Rockdale Cable T.V. Co. v. Spadora,* 97 Ill.App.3d 754, 53 Ill.Dec. 171, 423 N.E.2d 555, 559 (1981), the court stated that:

Neither was Spadora a party in his own right. Although named as a defendant, he was unserved. A party according to Section 60 is one "for whose immediate benefit the action is prosecuted or defended." No action against Spadora was being defended as no personal jurisdiction over him had been obtained, either by the coercive power of a summons or by the consensual authority of a voluntary appearance. A party ·by being present in court and testifying as a witness, with no further action by the witness or his attorney, does not generally appear so as to give the court jurisdiction over his person.

Thus, as affiants, the unserved heirs were nothing more than potential witnesses. However, after examining the record, we hold that the trial judge had a sufficient basis to conclude that the law firm, by its statements to the court, did make a general appearance for the unserved heirs.

## V. WAS SUMMARY JUDGMENT PROPER AS TO WIGGER'S CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT? (CROSS–APPEAL)

In August, 1980, Wigger commenced this suit in order to terminate the lease. On June 29, 1981, the attorney for Alaska Gold wrote Wigger's attorney stating that:

[t]his is to follow up on our telephone conversation earlier this month wherein I advised you that in our opinion the gravel located on the subject leasehold is subject to the lease and to advise you that pending resolution of the current litigation we must demand that Mr. Wigger refrain from removing any gravel from the leasehold.

Around August 1, 1981, Wigger and Mr. Wright agreed that Wright would purchase

**5.** Appellants also contend that Wigger waived his right to claim that the lease terminated because he agreed to include the reservation for royalties in the conveyance and therefore honored the lease. As stated above, we hold that the lease terminated in 1964. The inclusion of the reservation clause did not revive the lease. The reservation only provided the basis of a new and enforceable agreement between the heirs and Wigger that, if the lessee should mine, the heirs would receive royalties from Wigger.

from Wigger gravel for $2 a yard from the properties that are the subject of the suit. On August 11, 1981, Wigger's attorney wrote to Alaska Gold's attorney offering to put the proceeds from the proposed sale into escrow until it was determined who had the rights to the purchased gravel. Some time between August 20 and 27, Alaska Gold threatened Wright with an injunction and a lawsuit if he were to purchase the gravel from Wigger. Wright then purchased the needed gravel from Alaska Gold; the purchased gravel was removed from properties other than the properties described in the lease.

Bruce Duncan, the chief legal officer from Alaska Gold, stated in an affidavit that Alaska Gold did not agree to the escrow agreement because he believed

> that the Company had exclusive dominion and control pursuant to the lease over such gravel and that to allow the sale proposed by Mr. Wigger to proceed could have an adverse effect on Alaska Gold Company's position in this litigation that the gravel was exclusively reserved to Alaska Gold Company under its lease.

On cross-appeal, Wigger argues that the trial court erred in granting summary judgment in favor of Alaska Gold because there is a question of fact whether Alaska Gold was privileged to interfere with the contract. Alaska Gold contends that it was privileged to interfere with the contract for the sale of gravel under Restatement (Second) of Torts § 773, Asserting Bona Fide Claims.

In *Bendix Corporation v. Adams*, 610 P.2d 24, 27 (Alaska 1980), we outlined the elements of a prima facie case of tortious interference with contract as follows:

> (1) a valid contract existing between plaintiff and another person; (2) defendant had knowledge of the contract and intended to induce a breach thereof; (3) the contract was breached by the other party thereto; (4) the breach was caused by defendant's wrongful or unjustified conduct; (5) plaintiff suffered damage as a result of the breach.

In *Alyeska Pipeline Service Company v. Aurora Air Service, Inc.*, 604 P.2d 1090, 1095 (Alaska 1979), we stated that "when a prima facie case is made out by showing that a breach was intentionally procured, it is incumbent upon the defendant to show justification." ·

Restatement (Second) of Torts provides that:

> § 773.   Asserting Bona Fide Claim
>
> One who, by asserting in good faith a legally protected interest of his own or *threatening in good faith to protect the interest* by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

(Emphasis added).

In the case at bar, the only contested issue is whether Alaska Gold was privileged in procuring the breach.

As stated above, Restatement (Second) of Torts § 773 (1979) allows one to interfere with a contract by asserting a claim that one believes in good faith that his interests may be impaired or destroyed.

■ We hold that there is a genuine issue of fact as to Alaska Gold's motive to interfere with the contract; possibly the actual motive for interfering with the contract and for not entering into the escrow agreement was not based on the privilege of a bona fide claim but rather was based on the desire to receive the proceeds of the sale regardless of the outcome of the litigation.[6] We also find that Alaska Gold has failed to show how it would have been prejudiced if the sale had occurred.

■ Therefore, because "[t]he question of justification [and privilege] for invading the contractual interest of another is normally one for the trier of fact...." *Alyeska Pipeline*, 604 P.2d at 1094, and because

6.   *See Bendix Corp. v. Adams*, 610 P.2d 24, 31   (Alaska 1980).

there is a genuine issue of fact regarding Alaska Gold's motive, we find that summary judgment on this issue was improper.

CONCLUSION:

For the foregoing reasons, we hold that the trial court properly granted summary judgment for Wigger in regard to his cause of action for termination of the lease. However, we hold that the trial court erred in granting summary judgment for Alaska Gold on the cause of action against Alaska Gold for tortious interference with contract.

AFFIRMED in part, REVERSED in part, and REMANDED.