Alvin L. KILE and Leslie L. Maxwell,
Appellants, Cross–Appellees,

v.

Robert K. BELISLE, Stella D.
Lavender and Darrell Pelkey,
Appellees, Cross–Appellants.

Nos. S–1811, S–1835.

Supreme Court of Alaska.

Aug. 5, 1988.

Homer L. Burrell, Anchorage, for appellants, cross-appellees.

Gary R. Letcher, Birch, Horton, Bittner, Pestinger & Anderson, Anchorage, for appellees, cross-appellants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

This case involves a dispute over title to certain mining claims known as the "Squaw/Baby Creek" claims and the "Canyon Creek" claims, located in the vicinity of Boundary, Alaska. Alvin Kile and Leslie Maxwell assert title and ownership as holders of unpatented federal mining claims.[1] Robert Belisle, Stella Lavender, and Darrell Pelkey (hereinafter state claimants) assert title and ownership as holders of unpatented state mining claims. The trial court held that the state claimants had title to the Squaw/Baby Creek claims, and that Maxwell had title to the Canyon Creek claims. Kile and Maxwell together appeal from the former determination; the state claimants cross-appeal from the latter. We affirm the trial court's judgment as to the Squaw/Baby Creek claims and reverse as to the Canyon Creek claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The material facts are undisputed.

### A. *The Squaw/Baby Creek Claims*

At various times between 1939 and 1952, Jack, Shirley, and Katherine Wilkey located twenty-eight federal unpatented placer mining claims on Squaw Creek and Baby Creek near Boundary, Alaska. In 1966, an additional lode mining claim in the same area was located by the Wilkeys and another family.[2]

In 1972, the land encompassing the Squaw/Baby Creek claims was withdrawn from mineral entry by Public Land Order (PLO) 5250, 37 Fed.Reg. 18730. This order was a "d–2" withdrawal, made pursuant to the Alaska Native Claims Settlement Act for the purpose of considering lands for inclusion within the national park, forest, wildlife refuge, and wild and scenic river systems. 43 U.S.C. § 1616(d)(2)(A) (1986); 37 Fed.Reg. 18730.[3] The withdrawal, however, was expressly made subject to "valid existing rights." *Id.* at 18734.

The Wilkeys performed the annual labor necessary to maintain their claims in good standing through the assessment year ending September 1, 1973.[4] After that date, the Wilkeys performed no assessment work for the benefit of the Squaw/Baby Creek claims. In fact, after Jack Wilkey's death in late September 1974, Katherine Wilkey had nothing more to do with the mining claims.

Sometime in 1974, Kile and Maxwell located federal unpatented placer claims more or less on top of the Wilkeys' Squaw/Baby Creek claims. These claims, however, were void *ab initio*[5] because of the 1972 land withdrawal forbidding mineral entry.[6]

In July, 1976, after learning that the claims they had located were invalid, Kile and Maxwell sought out Katherine Wilkey and obtained from her a quitclaim deed to

---

1. Kile and Maxwell together assert ownership of the Squaw/Baby Creek claims. Maxwell alone asserts ownership of the Canyon Creek claims.

2. The parties agree that, for purposes of this appeal, the lode claim shall be included with and considered one of the Squaw/Baby Creek claims.

3. *See generally* 1 Rocky Mtn. Min. L. Found., American Law of Mining § 14.01 *et seq.* (2d ed. 1987) (discussing law and policy of federal land withdrawals) (hereinafter ALM).

4. An assessment year runs from 12:00 noon, September 1 until 12:00 noon, September 1 of the following year. 43 C.F.R. § 3833.01–5(n) (1985).

5. The general rule is that mining claims located upon lands withdrawn from mineral entry are void *ab initio*. *Goldfield Mines v. Hand,* 147 Ariz. 498, 711 P.2d 637, 644 (App. 1985); *In re Dilley,* 87 I.B.L.A. 150 (1985); 1 ALM § 14.05[3] & n. 62.

6. Kile and Maxwell do not dispute that the claims they located were invalid and the validity of those claims is not at issue here.

the Squaw/Baby Creek claims. From 1977 on,[7] Kile and Maxwell have performed annual labor for the benefit of the Squaw/Baby Creek claims and timely recorded and filed the requisite affidavits attesting thereto.

In 1981, PLO 6042, 46 Fed.Reg. 57048 (1981), was issued, partially rescinding the withdrawal effected by PLO 5250, and opening the land encompassing the Squaw/Baby Creek claims to selection by the state or by native corporations. In 1982, the state selected certain lands for conveyance and subsequently opened it to mineral entry.

In May, 1984, state claimants located thirty-nine state unpatented placer mining claims pursuant to AS 38.05.195, more or less on top of the Squaw/Baby Creek claims.[8] In 1984, when the Bureau of Land Management (BLM) issued its tentative approval for conveyance of the state-selected lands, state claimants obtained possessory rights in the located claims.[9]

### B. *The Canyon Creek Claims*

Sometime between 1961 and 1963, George Gilbertson and his partners located ten unpatented federal placer mining claims on Canyon Creek. During the years between 1964 and 1976, Gilbertson and his associates failed to perform annual labor on the Canyon Creek claims.

In 1972, the lands encompassing the Canyon Creek claims were also withdrawn from mineral entry by PLO 5250. In 1973, Leslie Maxwell located new placer claims on Canyon Creek, more or less on top of the Canyon Creek claims. Maxwell performed annual labor on the new claims from 1974–76. However, like the Squaw/Baby Creek claims, these claims were void *ab initio* by virtue of the PLO 5250 withdrawal.[10]

In September, 1976, Gilbertson quitclaimed the Canyon Creek claims to Maxwell in exchange for $100. The assessment work on the claims was delinquent at that time. It is conceded for purposes of this appeal that Maxwell has adequately performed and recorded assessment work on the Canyon Creek claims since 1977.

PLO 6042 opened the lands encompassing the Canyon Creek claims to selection in 1981 and they were selected by the state for reconveyance in 1982. In May, 1984, the state claimants located nine placer claims on the state-selected lands more or less on top of the old Canyon Creek federal claims. These claims matured into possessory interests in September, 1984, when the BLM issued its tentative approval of the conveyance to the state.

Thus, in 1984, just prior to the initiation of this lawsuit, Kile and Maxwell purported to hold the federal unpatented

7. There was some dispute below regarding assessment work for 1977 and 1978. However, state claimants concede the issue for purposes of this appeal. Assessment work from 1979 onward is undisputed.

8. Alaska statute 38.05.195 provides:

Rights to deposits of minerals subject to §§ 185–280 of this chapter in or on state lands which are open to claim staking may be acquired by discovery, location and filing as prescribed in §§ 185–280 of this chapter. The locator has the exclusive right of possession and extraction of all such minerals lying within the boundaries of his claim. A location may not exceed 1,320 feet in its longest dimension, and its boundaries shall run in the four cardinal directions. A location shall be distinctly marked on the ground in the manner prescribed by the commissioner and a notice of location shall be posted on the claim in the manner and containing the information required by the commissioner. Within 90 days after the date of posting the notice of location on the claim, the locator shall file for record in the recording district where the claim is located a certificate of location. The certificate of location shall contain the information required by the commissioner. Locations may be amended in the manner and with the effect prescribed in § 200 of this chapter. Annual labor shall be performed and statements of annual labor recorded as prescribed in §§ 210–235 of this chapter.

9. The location itself gave the state claimant no possessory interest because the conveyance to the state had not then been tentatively approved by the BLM. Instead, the state claimants only gained priority rights as against subsequent locators which matured into a right of exclusive possession upon the BLM's tentative approval of the conveyance. *See* 11 AAC 86.115 (eff. 9/5/74; am. 5/30/85).

10. *See supra* note 5.

Squaw/Baby Creek claims, Maxwell the federal unpatented Canyon Creek claims, and the state claimants the top-filed state claims at both sites. The federal and state claims being more or less upon the same ground, disputes eventually arose and this lawsuit was commenced.

### C. *Proceedings Below*

In June, 1985, Kile and Maxwell filed an action concerning the Squaw/Baby Creek claims, seeking quiet title, injunctive relief, ejectment, an accounting, and damages. The state claimants counterclaimed, seeking to quiet title to the Canyon Creek claims.

After a two day bench trial, the superior court issued findings and conclusions. As to the Squaw/Baby Creek claims, the court found that the Wilkeys had, sometime prior to 1976, abandoned the claims, and thus Katherine Wilkey had no interest to convey to Kile and Maxwell under the 1976 quitclaim deed. Accordingly, the trial court concluded that Kile and Maxwell had no interest in the Squaw/Baby Creek claims and therefore found for the state claimants.

In regard to the Canyon Creek claims, the trial court found in favor of Maxwell, holding as a matter of law that Maxwell, as a successor-in-interest to the locator of the Canyon Creek claims, had a "valid existing right" to cure the Canyon Creek claims by resumption of the annual assessment labor. This "right," the court concluded, survived the "d-2" withdrawal of PLO 5250. The trial court subsequently entered a final judgment incorporating its findings and conclusions. This appeal and cross-appeal followed.

## II. DISCUSSION

### A. *The Squaw/Baby Creek Claims*

The main argument raised by Kile and Maxwell on appeal is that the trial court erred in finding that Katherine Wilkey had abandoned the Squaw/Baby Creek claims.[11]

■ Where miners make a discovery of valuable mineral deposits and comply with the applicable laws regarding location,[12] they acquire vested possessory property rights in the mining claim. 1 ALM § 30.05[6]. Like other property, however, mining claims may be abandoned.

■ Whether an abandonment has occurred is to be determined by the trier of fact from all the facts and circumstances of the particular case. *United States v. Eaton Shale Co.*, 433 F.Supp. 1256, 1274 (D.Colo.1977); *Peachy v. Frisco Gold Mines Co.*, 204 F. 659, 668 (D.Ariz.1913). *See generally* 1 ALM § 30.05[10], 2 ALM § 46.01[8][a], at 30–19, 46–11 to 46–14. In reviewing such determinations by the trial court, we apply a "clearly erroneous" standard of review. Alaska R.Civ.P. 52(a). Under this standard, we will not set aside a trial court's factual findings unless, with due regard given to the opportunity of the trial court to judge the credibility of witnesses, we hold a definite and firm conviction that a mistake has been made. *E.g., Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 347 (Alaska 1982); *Olsen & Sons Logging v. Owens*, 607 P.2d 949, 952 (Alaska 1980). We hold no such conviction in this case.

■ Abandonment is the intentional relinquishment of a mining claim. *Dodge v. Wilkinson*, 664 P.2d 157, 159 n. 3 (Alaska 1983). It is a voluntary act on the part of a

---

**11.** Kile and Maxwell make four other arguments. In the first two, they claim the federal government recognized the validity of their claims by referring to them in the exclusions section of the BLM's 1984 tentative conveyance approval. We agree with the trial court's conclusion that such reference did not constitute federal "recognition" of the validity of those claims, and we think that the tentative approval itself is of little evidentiary significance with regard to the issue of abandonment. Kile and Maxwell's additional arguments are based upon the Federal Land Policy Management Act

(FLPMA), 43 U.S.C. §§ 1701–1784 (1986), which was not in effect at the time the events relative to this litigation took place and which would not, in any case, dispose of the abandonment issue.

**12.** *See* 30 U.S.C. § 28 (1986) (federal law requirements); AS 27.10.010–.240 (state law requirements for claims on federal land); AS 38.05.185 (state law requirements for claims on state land).

claimant and consists of a subjective intent to abandon coupled with an external and objective act by which that intent is carried into effect. *See, e.g., Harkrader v. Carroll,* 76 F. 474, 475 (D.Alaska 1896); *O'Hanlon v. Ruby Gulch Mining Co.,* 48 Mont. 65, 135 P. 913, 918 (1913). In *Peachy,* the court supplied the following often-cited definition of abandonment:

Abandonment includes both the intention to abandon and the act by which the abandonment is carried into effect. To constitute an abandonment there must be a concurrence of the intention to abandon and the actual relinquishment of the property so that it may be appropriated by the next comer.

. . . .

*To constitute an abandonment there must be a going away, and a relinquishment of rights, with the intention never to return.* A voluntary and independent purpose to surrender whatever claim the person has to the next comer is essential. It is thus a question of act and intention, and the fact is to be found from the intention and the act, when considered together, in connection with all the circumstances in the case. The testimony of the fact of abandonment by a former owner is conclusive evidence thereof; and evidence upon this question is admissible under the general issue. But there must be an abandonment in fact. A mere belief on the part of the relocator that such is the case is not sufficient to establish one.

204 F. at 668 (*quoting* 1 Snyder on Mines §§ 509, 512) (emphasis added). *See also* 2 ALM § 46.01[8][a].

While it is well recognized that abandonment must be established by clear and convincing evidence, and that the burden of proof is on the party asserting it, *see, e.g., Eaton Shale Co.,* 433 F.Supp. at 1274; *Loeser v. Gardiner,* 1 Alaska 641, 647–48 (D.Alaska 1902); *Velasco v. Mallory,* 5 Ariz.App. 406, 427 P.2d 540, 546

(1967); 2 ALM § 46.01[8][b], we are satisfied that in the case at bar the record supports the trial court's finding of abandonment.

The evidence at trial established that Katherine Wilkey never returned to the claims following her husband's death. She neither performed the annual labor on her own, nor arranged for others to perform it on her behalf.[13] Moreover, Mrs. Wilkey's testimony at trial evidenced her intent to abandon the claims following her departure from the site. She testified in part:

Q. And when did you say the last time was that you did assessment work?

A. 1973. Jack died in 1974.

Q. And what happened with respect to the mining operation or mining claims on Squaw Creek after 1973?

A. The assessment wasn't done because I didn't care one way or another.

. . . .

Q. O.K., and then what was your position with respect to the Squaw Creek mining claims [after your husband's death]?

A. I had no reason—after '74 or when?

Q. After '73.

A. I had no—figured that I would never go back out there.

Q. So you had no interest in going back out there again?

A. No.

Similarly, she later testified:

Q. [A]fter your husband died, you decided that you didn't want to have anything more to do with the mining claims?

A. That's right.

We believe that the foregoing was sufficient evidence upon which the court could base its conclusion that Mrs. Wilkey had abandoned her claim prior to the attempted conveyance in 1976. *See Harkrader v. Carroll,* 76 F. 474, 475–76 (D.Alaska 1896)

---

13. While failure to perform annual labor does not by itself constitute abandonment, "it [is] well established that the failure to do assessment work [is] evidence of abandonment." *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 56, 91

S.Ct. 196, 201, 27 L.Ed.2d 193, 200 (1970). *Cf.* AS 38.05.265 (failure to properly file statement of annual labor constitutes abandonment of all rights acquired under a state mining lease on state lands).

(claimholder's statements that he "went away sick and disgusted" from the site and that he had "[given] up all hopes of returning to the claim," coupled with his non-performance of assessment work thereon held sufficient to establish abandonment).[14] Since she had no valid interest to convey at the time she executed the quitclaim deed, that document passed no valid interest to Kile and Maxwell. We therefore affirm the trial court's judgment as to the Squaw/Baby Creek claims.

### B. The Canyon Creek Claims

#### 1. Introduction.

On the state claimants' counter-claim to quiet title to the Canyon Creek claims, the trial court found in favor of Maxwell, the federal claimant. The court held that the "valid existing rights" clause of PLO 5250 preserved Maxwell's right, as a successor in interest to the claim, to cure his predecessor's default in annual labor by resuming assessment work prior to relocation by a subsequent claimant. This was so, the court reasoned, even though the lands had been withdrawn from mineral entry prior to the cure.

The issue before us on this cross-appeal is whether a successor-in-interest to a federal mining claim can cure his predecessor's failure to perform annual labor after the lands encompassing the claims have been withdrawn from mineral entry. To answer that question in the present con-text, we must determine whether the "valid existing rights" clause in PLO 5250 preserved Maxwell's "right" to cure defaults in annual labor by resumption of assessment work.[15]

The state claimants argue that a withdrawal of lands from mineral entry extinguishes the "right" to cure defaults of annual labor. Analogizing to federal cases in related areas, they assert that by virtue of PLO 5250 the United States became, by operation of law, a relocator as to all federal mining claims not in compliance with the mining laws at the time of, and after, the date of the withdrawal. Accordingly, they contend that any claims in default on annual labor after the date of the withdrawal were automatically forfeited to the United States.

We accept the state claimants' position, with one modification. Claims which were not in substantial compliance at the time of the withdrawal with annual labor requirements were not valid existing rights under the savings clause. However, claims where the default was not substantial were preserved. We base this conclusion on the reasoning in *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), and on several Interior Department rulings.

We begin with several observations. First, during the period of time in question here,[16] under both the General Mining Act of 1872 [17] and state law,[18] resumption of

---

**14.** It is not controlling that Mrs. Wilkey left certain of her personal effects in a cabin on one of the the claims. Indeed, the most logical inference to be drawn from this fact is that she abandoned those possessions along with the cabin itself. Nor is it dispositive that Mrs. Wilkey endeavored to convey the property by quitclaim, presumably believing she owed it, or that she did so within just a few years following her husband's death. This was merely additional evidence for the court to weigh in considering the question. That the trial court did not find them decisive is not reversible error. *See Brooks v. Brooks*, 733 P.2d 1044, 1051 (Alaska 1987) ("[i]t is not our job to reweigh the evidence placed before the trial court. We merely determine whether the trial court's finding is supported by the record.").

**15.** This issue is a question of law. We review questions of law under an independent judg-ment standard of review. *See Norton v. Alcoholic Beverage Control Bd.*, 695 P.2d 1090, 1092 (Alaska 1985); *Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 833–34 (Alaska 1974). Under this standard, it is our duty to adopt the rule best supported by policy, precedent, and reason. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**16.** Now, FLMPA provides that a locator must file and record affidavits of annual labor or the claims will conclusively be deemed abandoned and void. 43 U.S.C. § 1744(c) (1982). As noted *supra* note 11, however, FLMPA is not applicable here.

**17.** Now codified as 30 U.S.C. § 28 (1982), this section provides in relevant part:

On each claim located after ... 1872, and until a patent has been issued therefor, not

annual labor cured a previous default so long as the rights of another party had not intervened. *See Dodge*, 664 P.2d at 159 n. 3; *Lowe v. United States Smelting, Refining & Mining*, 175 F.2d 486, 487 (9th Cir. 1949), *vacated on other grounds*, 338 U.S. 954, 70 S.Ct. 493, 94 L.Ed. 588 (1950); *Debney v. Iles*, 3 Alaska 438, 448 (D.Alaska 1907). Second, the question presented is one of federal law: what is the meaning and legal effect of PLO 5250, promulgated by the Secretary of the Interior on September 12, 1972? In determining the question of the Secretary's meaning, it is important to focus on contemporaneous and preceding events which supply the context for the order. *See generally United States v. Price*, 361 U.S. 304, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616, 626 (1960). Third, the validity of the claims must be determined as of the effective date of the withdrawal. *See generally Skaw v. United States*, 740 F.2d 932, 940 (D.C.Cir.1984); *United States v. Chappell*, 72 I.B.L.A. 88, 93 (1983).

> 2. *Hickel v. Oil Shale Corp.* suggests that, in any withdrawal context, claims which are not in substantial compliance with the annual work requirement are divested.

About a year and a half before PLO 5250 was promulgated, the Supreme Court decided the landmark case of *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). In *Hickel*, miners had filed claims on lands containing oil shale deposits shortly before the February 25, 1920 deadline established by the Mineral Lands Leasing Act which closed oil shale lands to mineral location. *Id.* at 59, 91 S.Ct. at 202, 27 L.Ed.2d at 201. That act contained a savings clause which excepted "valid claims existent on February 25, 1920, and thereafter maintained in compliance with the laws under which initi-

ated...." 30 U.S.C. § 193 (1982). The Secretary cancelled the claims because assessment work was not done on them following the February 1920 deadline. 400 U.S. at 50, 91 S.Ct. at 198, 27 L.Ed.2d at 196. Between 1955 and 1962, several of the claimants applied for patents. The Secretary admitted that the original cancellations may have been erroneous in light of two subsequent decisions of the United States Supreme Court involving other cancelled oil shale claims, *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) and *Ickes v. Virginia–Colorado Development Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). The Secretary nonetheless determined that the cancellations were effective and rejected the patent applications. 400 U.S. at 50, 91 S.Ct. at 198, 27 L.Ed.2d at 196. This determination was reversed in the district court; the district court was affirmed in the court of appeals based on the *Krushnic* and the *Virginia–Colorado* cases. *Id.* at 51, 91 S.Ct. at 198, 27 L.Ed.2d at 197. However, the Supreme Court upheld the Secretary. The Court distinguished *Krushnic* and *Virginia–Colorado* on the grounds that in both those cases there was substantial compliance with the annual work requirements (in each case only one year had been missed) whereas in the claims involved in *Hickel* there was almost no work done. *Id.* at 57, 91 S.Ct. at 201, 27 L.Ed.2d at 200.

*Hickel* is distinguishable from the present case in that the Mineral Lands Leasing Act savings clause referred to "valid claims existent on February 25, 1920 and thereafter maintained in compliance with the laws under which initiated" rather than merely to "valid existing rights." However, there is much reasoning in the *Hickel* opinion which does not rely on the special "thereafter maintained" clause.

---

less than $100 worth of labor shall be performed or improvements made during each year.... [U]pon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, *provid-*

ed that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location. (Emphasis added).

**18.** Alaska Statute 27.10.150(b).

The Court clearly rejected the view taken in *Krushnic* and in *Virginia–Colorado* that unexcused noncompliance with the assessment work requirement may never give rise to a forfeiture and is of benefit only to a subsequent locator. The court stated: "There are, however, dicta both in *Virginia–Colorado* and *Krushnic* that the failure to do assessment work gives the Government no ground for forfeiture but inures only to the benefit of relocators." 400 U.S. at 52, 91 S.Ct. at 199, 27 L.Ed.2d at 197–98. Based on the legislative history of the General Mining Act of 1872,[19] not on the special language of the savings clause, the Court rejected this dicta:

> While the objective of the 1872 Act was to open the lands "to a beneficial use by some other party," once the original claimant defaulted, the defeasance inevitably accrued to the United States, owner of the fee. On that premise it would seem that the dicta in *Krushnic* and in *Virginia–Colorado* are not valid.

400 U.S. at 55, 91 S.Ct. at 200, 27 L.Ed.2d at 199.

Further, one of the main reasons given by the Supreme Court in *Hickel* for imposing a rule of forfeiture was also applicable to the situation existing in 1972 when the secretary issued PLO 5250. The primary enforcement mechanism of the annual work requirement was the possibility that a relocator might top file. That mechanism was, however, eliminated by the withdrawal accomplished by the Minerals Lands Leasing Act in 1920 just as it was eliminated by PLO 5250. In the court's words,

> So if enforcement of the assessment work requirement ... were dependent solely on the activities and energies of ... relocators, there was no effective enforcement device.... That meant that a claim could remain immune from challenge by anyone with or without any assessment work, in complete defiance of the 1872 Act.

400 U.S. at 56, 91 S.Ct. at 201, 27 L.Ed.2d at 199–200.

The Court made it clear that the withdrawal effected by the Mineral Leasing Act (not the special language of the savings clause) "completely changed the national policy" over the lands in question. 400 U.S. at 51, 91 S.Ct. at 198, 27 L.Ed.2d at 197. The Court stated in language which is as applicable to the withdrawal presently before us as it is to the 1920 withdrawal: "[The Act] reclaimed portions of the public domain so that land might be ... devoted to wholly different purposes within the purview of public policy as determined by Congress." 400 U.S. at 53–54, 91 S.Ct. at 199–200, 27 L.Ed.2d at 198 (footnotes omitted).

Others also construe *Hickel* to reach beyond the Mineral Lands Leasing Act of 1920. Significantly, in 1971 the Secretary of the Interior began the process of amending its regulations relating to assessment work under the 1872 Mining Law. The regulations, which were promulgated by the Secretary effective September 9, 1972, delete a regulation whose philosophy would support Maxwell's right to the Canyon Creek claims. The deleted regulation provided:

> The annual expenditure of $100.00 in labor or improvements on a mining claim, required by [30 U.S.C. § 28] is ... solely a matter between rival or adverse claimants to the same mineral land, and goes only to the right of possession, the determination of which is committed exclusively to the courts.[20]

In addition to striking the above language, the new regulations provide:

> Failure of a mining claimant to comply substantially with the requirement of an annual expenditure of $100.00 in labor or improvements on a claim imposed by section 2324 of the Revised Statutes (30 U.S.C. 28) will render the claim subject to cancellation.[21]

In a memorandum accompanying the new regulations, the Assistant Secretary

---

**19.** *See* note 17 *supra.*

**20.** 43 C.F.R. 3851.4 (1971), *deleted by* 37 Fed. Reg. 17836 (1972).

**21.** 43 C.F.R. § 3851.3(a) (1987), 37 Fed.Reg. 17836 (1972).

noted that objections had been received which contended that *Hickel* should be limited to the Mineral Leasing Act of 1920. While acknowledging that the question might ultimately have to be resolved in the courts, the Secretary rejected this reading of *Hickel.* 37 Fed.Reg. 17836 (1972); Sherwood, *Improvement of Mining Claims,* 18 Rocky Mtn.Min.L.Inst. 149, 169 n. 93 (1973).

The author of an article on assessment work in a leading mining law treatise has also concluded that the reasoning in the *Hickel* case should apply to claims on lands which have been covered by any withdrawal order:

> The rationale in the *Hickel* case clearly should apply ... to claims situated on lands withdrawn from mineral entry, for any reason, subsequent to the location of those claims. *See, e.g., United State v. Haskins,* 88 I.D. 925, GFS (MIN) 375 (1981) (claims located on lands subsequently withdrawn from location); *cf., e.g., Duval v. Morton,* 347 F.Supp. 501 (D.Or.1972) (discovery made on lands withdrawn from mineral entry).

2 Rocky Mtn.Min.L.Found., *American Law of Mining,* § 45.08[2] [c], at 45–71 n. 39 (2d ed. 1987). We agree with this conclusion.

3. Interior Department rulings take the position that divestment of claims which have not been maintained in substantial compliance with the annual work requirement occurs when the lands are withdrawn.

The *Haskins* case cited in the excerpt from *American Law of Mining,* above, is particularly instructive. Like the present case, it involved the question of whether there had been substantial compliance with the annual work requirement of the 1872 Act prior to a withdrawal which saved "any lawful right which has already attached under the mining laws and which is hereafter maintained in accordance with such laws." 88 Interior Dec. at 928. The Interior Board of Land Appeals noted that the question presented was not whether the claim had been maintained after the withdrawal, but whether the claim was valid at the time of the withdrawal. 88 Interior

Dec. at 976 n. 51. The Board concluded that the failure of the claimant to comply substantially with the annual work requirement resulted in "an effective forfeiture of the claim to the United States" as of the date of the withdrawal. 88 Interior Dec. at 976.

Since at least 1904, the Interior Department has recognized that when land is withdrawn from mineral location, mining claims on which annual assessment work has not been performed are not "valid." The Secretary issued Instructions to this effect to the Director of the Geological Survey. 32 Pub. Lands Dec. 387 (1904). Referring with approval to a report by the Commissioner of the General Land Office, the Instructions state:

> As to mineral locations ... the Commissioner concludes that in order to defeat the operation of a withdrawal ... the location must have been made prior thereto and be a valid one—that is, founded on an actual discovery by the locator of a valuable deposit of mineral within the limits of the claim and maintained in accordance with the mining laws....

*Id.* at 387. The Secretary added:

> [U]nless a claimant to lands covered by such withdrawals *had acquired at the date of such withdrawals* a *vested* interest in the land so as to deprive Congress of the power of disposition and control over the same, it is subject to the operation of such withdrawals.

*Id.* at 388 (emphasis added). The Secretary proceeded to suggest that unpatented claims on which the locator has not performed the annual assessment work required by statute would be divested by a withdrawal.

> With reference to the character of rights acquired by claimants to lands under the mineral laws ... only the general rule can be stated. A safe and comprehensive statement of that rule is found in the decision of the Department in American Hill Quartz Mine (Sickels' Mining Laws, 377, 385), quoted approvingly by the supreme court in *Benson Mining Co.*

*v. Alta Mining Co.* (145 U.S. 428, 430, 12 S.Ct. 877, 878, 36 L.Ed. 762):

> At the outset it is proper to remark that by the mining laws of the United States three distinct classes are created, viz.: 1. Title in fee simple. 2. Title by possession. 3. The complete equitable title. The first vests in the grantee of the government an indefeasible title, while the second vests a title in the nature of an easement only. The first, being an absolute grant by purchase and patent without condition, is not defeasible, while the second, being a mere right of possession and enjoyment of profits without purchase and upon condition, may be defeated at any time by the failure of the party in possession to comply with the condition, viz.: to perform the labor or make the annual improvements required by the statute. The equitable title accrues immediately upon purchase, for the entry entitles the purchaser to a patent, and the right to a patent once vested is equivalent to a patent issued.
>
> After a complete equitable title has vested, the United States can no longer exercise ownership over the property. But it will be seen that a possessory right may also be acquired under the mining laws, which is a vested right, although the acquisition of title is not contemplated. Such a right, however, is subject to be divested by failure to comply with the law, and the land department has jurisdiction to determine that question and to declare by its judgment whether such right has been divested, so as to restore the land to the control of the government. As to such possessory claims no definite rule can be given for your guidance, in the absence of some particular case.

*Id.* at 388–89.

The validity of the Instructions referred to above was confirmed in the case of *E.C. Kinney,* 44 Pub.Lands Dec. 580 (1916). There, the Assistant Secretary wrote:

> The effect of withdrawal ... was considered in 32 L.D. 387, and it was there stated that an unperfected mining claim is merely a possessory right which is liable to be divested for failure to perform the necessary yearly labor.... This is undoubtedly the true rule, for where a claimant is in default so that his claim could be defeated by another individual adverse claimant, surely the Government, desiring to devote the land to an important public use, may likewise take advantage of the default and divest the claim so as to free the land for Government use. Of course, where the Government takes a claim subsisting and valid the value thereof should be paid. This may be reached by condemnation proceedings or by mutual agreement.

*Id.* at 582. The Assistant Secretary left no doubt that, in that case, the four claims on which annual assessment work had not been performed were not "subsisting and valid" and because of this declined to award compensation for their flooding as a result of construction of a dam.

4. Conclusion.

We conclude that an order withdrawing lands from mineral location divests mining claims on which there has not been substantial compliance with the annual assessment requirements; to put it another way, a savings clause excepting "valid existing rights" does not apply to mining claims which are not substantially in compliance with annual assessment requirements at the time of withdrawal.

Ordinarily, the question of substantial compliance would be a question for the trier of fact. However, there is no genuine issue here since annual labor was not done at all in the eight years immediately preceding PLO 5250. Thus, we reverse the judgment of the superior court as to the Canyon Creek claims.

Judgment AFFIRMED as to the Squaw/Baby Creek claims and REVERSED as to the Canyon Creek claims.