Howard P. MISCOVICH, and Miscovich Mining Company, Appellants,

v.

Keith E. TRYCK, Andrew Miscovich and State of Alaska, Appellees.

No. S–5503.

Supreme Court of Alaska.

June 17, 1994.

Richard R. Cole, Fairbanks, for appellants.

Dan K. Coffey and Eric R. Cossman, Law Offices of Dan K. Coffey, Anchorage, for appellee Tryck.

Charles D. Silvey, Staley, DeLisio & Cook, Fairbanks, for appellee Miscovich.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON, JJ., and BRYNER, J., Pro Tem.*

*OPINION*

BRYNER, Justice, Pro Tem.

This case arises from a dispute concerning the ownership of two distinct clusters of mining claims located on Poorman Creek, denominated the Upper and Lower Poorman claims. Keith Tryck filed a superior court action to quiet title to the claims. The action was disputed by Howard Miscovich, Andrew Miscovich, and Miscovich Brothers, a mining partnership. The superior court awarded Tryck exclusive title to the Upper Poorman claims and a one-half interest in the Lower Poorman claims. The court divided the remaining half interest in the Lower Poorman claims between Howard Miscovich and Andrew Miscovich, awarding three-quarters (or three-eighths of the total Lower Poorman claims) to Howard and one-quarter (or one-eighth of the total) to Andrew.

Howard Miscovich appeals, challenging the awards to both Tryck and Andrew Miscovich. Howard Miscovich also challenges the superior court's award of certain costs and attorney's fees to Tryck. We affirm the superior court's rulings as to Tryck, but reverse the court's decision awarding partial title to Howard Miscovich and Andrew Miscovich, rather than to the Miscovich Brothers partnership.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jack and Virginia Shropshire (Shropshire) began mining gold from the Upper and Lower Poorman claims in the 1930's. In the early 1940's, Shropshire located and staked the claims in accordance with federal mining laws. Shropshire relocated and re-recorded the claims in 1946.

On August 13, 1954, Shropshire deeded an undivided one-half interest in the Lower Poorman claims to Miscovich Brothers, a partnership comprised of brothers George, John, Howard, and Andrew Miscovich. In exchange, Miscovich Brothers agreed to conduct the annual assessment work on the claims.

The following year, on May 1, 1955, Shropshire entered into a lease with Miscovich Brothers for the Upper Poorman claims. The lease was to remain in effect "until said claims are·worked out unless sooner forfeited through violation of any covenant hereinafter contained to be performed by said Lessees [Miscovich Brothers]." The covenants of the lease required, among other things, that the Miscovich Brothers mine "in a workmanlike manner . . . all ground that can be mined at a profit" and "perform all the annual assessment work required to be done under the law, during the term of this lease upon said mining claims."

Between 1955 and 1958, Miscovich Brothers mined the claims and filed assessment work notices. Because government control held gold prices at $35 per ounce, however, the mining was not economically feasible. Miscovich Brothers ceased mining the area in the fall of 1958, after having incurred substantial debt. From 1959 through 1967, the claims lay idle, and no assessment notices were filed.

In 1968, Howard Miscovich returned to the Poorman Creek area and resumed filing annual assessment notices on the claims in the name of Miscovich Brothers. In 1973, brothers John, George and Andrew Miscovich conveyed to Howard Miscovich all of the mining equipment on the claims and agreed to permit him to continue mining the property "for his own account." From that point on, Howard Miscovich filed annual assessment notices on the claims in the name of Miscovich Mining, a partnership consisting of Howard and his wife, Donna Miscovich. He continued filing the annual notices until the time of trial.

In 1983, two of Howard Miscovich's brothers, George and John, assigned to Howard their partnership shares in the Lower Poorman claims. Andrew Miscovich, however, did not convey his interest to Howard.

Meanwhile, Shropshire had been living outside Alaska. In 1982, Howard Miscovich

---

* Sitting by assignment made under article IV, sec- tion 16 of the Alaska Constitution.

was contacted by Resource Associates, a mining company that was interested in purchasing the Poorman claims. Miscovich wrote a letter to Shropshire in March 1982 informing him of Resource Associate's interest and requesting Shropshire's presence in Alaska.[1] Shropshire traveled to Fairbanks the following month and met with Resource Associates. Although the company proposed a purchase agreement to Shropshire, the agreement never came to fruition.

In 1986, Keith Tryck, who was writing a book on the Poorman Mining District, contacted Shropshire. Tryck informed Shropshire that he had seen no indication of mining activity in the area and that other miners had told him that Miscovich had not been mining there for some time. On November 25, 1987, Shropshire sent a letter to Howard Miscovich, terminating the lease on the Upper Poorman claims because, as Shropshire testified, "nothing had been done on the claims for a long time." On December 14, 1987, Shropshire and Tryck entered into an agreement whereby Shropshire quitclaimed any interest he had in the Upper and Lower Poorman claims to Tryck.

Tryck then filed suit to quiet title to the Upper and Lower Poorman claims. Shortly thereafter, Howard Miscovich staked state mining claims on the land covered by the Upper and Lower Poorman claims and filed location notices on the state claims.

On May 13, 1992, the superior court issued a Memorandum Decision and Order awarding Tryck title to the entire Upper Poorman claims and half of the Lower Poorman claims. The court awarded the remaining half-interest in the Lower Poorman claims to brothers Howard and Andrew Miscovich, dividing the award three-quarters to Howard and one-quarter to Andrew. The court also awarded attorney's fees in the amount of $12,800 and costs of $7,934.52 to Tryck.

Howard Miscovich (Miscovich) appeals the superior court's ruling.

## II. DISCUSSION

### A. *Standard of Review*

■■■ This appeal involves issues of both law and fact. In reviewing questions of law, this court will "adopt the rule of law that is most persuasive in light of precedent, reason and policy." *Guin v. Ha,* 591 P.2d 1281, 1284, n. 6 (Alaska 1979). In reviewing questions of fact, this court will not set aside a trial court's findings of fact unless clearly erroneous. Alaska R.Civ.P. 52. A finding of fact is clearly erroneous when this Court is left with "a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." *Mathis v. Meyeres,* 574 P.2d 447, 449 (Alaska 1978). In making this determination, this court must view the evidence in the light most favorable to the prevailing party below. *Id.*

### B. *Challenges to Both the Upper and Lower Poorman Claims*

#### 1. *Propriety of action to quiet title*

Miscovich first contends that Tryck should have been barred from prevailing on his quiet title claim because he failed to allege or prove possession.

■■■ To prevail in an action to quiet title to real property, a plaintiff must prove possession of the property; otherwise the proper cause of action is ejectment. AS 09.45.-010; *Welcome v. Jennings,* 780 P.2d 1039, 1042 (Alaska 1989); *Shope v. Sims,* 658 P.2d 1336, 1339 (Alaska 1983). However, the possession requirement may be met through a showing of "constructive possession." *Welcome,* 780 P.2d at 1043. In *Welcome,* we held that the plaintiff's "compliance with statutory requirements ... [relating to discovery, location, and recordation of a mining claim,] is sufficient to establish constructive possession of the claims and permit him to maintain a quiet title action." 780 P.2d at 1043.

---

1. The letter stated:
 Dear Jack: Resources [sic] Associates of Alaska, a mining company, is interested in leasing all the ground on Lower Poorman Creek with an option to buy. I would like you to come up into Poorman as soon as possible to help me identify all this ground and bring all your location notices.

■ The superior court found that Tryck performed the required assessment work for 1988 and 1989, filing proof of compliance with the federal government. The court also found that Miscovich, acting in his capacity as lessee and co-owner of the mining claims, had filed the required assessment notices for the other relevant years, except for the period in between 1958–68, in which no other person relocated the claims. *See Dodge v. Wilkinson,* 664 P.2d 157, 159 n. 3 (Alaska 1983) (holding that where "claims were subject to relocation for a considerable period of time because no annual assessment work was performed on the claims, [the] resumption of assessment work ... cured this default because it occurred prior to any relocation by another person."); 2 *American Law of Mining* § 45.09[1] (2d ed. 1984); 30 U.S.C. § 28 (1988). The trial court found this evidence sufficient to support the conclusion that Tryck and his predecessor in interest, Shropshire, met the requirements for constructive possession and that Tryck could therefore maintain an action to quiet title to the claims. We find no error.

### 2. *Abandonment*

■ As to both the Upper and Lower Poorman claims, Miscovich argues that Shropshire's prolonged absence from the state, combined with his failure to initiate any contact with Miscovich for over 35 years, constituted abandonment. Abandonment of mining claims must be established by clear and convincing evidence. *Kile v. Belisle,* 759 P.2d 1292, 1296 (Alaska 1988); *Dodge,* at 159 (Alaska 1988). In *Kile,* this court defined abandonment as "the intentional relinquishment of a mining claim ... a voluntary act on the part of a claimant [which] consists of a subjective intent to abandon coupled with an external and objective act by which that intent is carried into effect." 759 P.2d at 1295–96; *see also* 1 *American Law of Mining,* § 46.01[2]. This court reviews a trial court's determination as to whether an abandonment

has occurred under the clearly erroneous standard. *Kile,* 759 P.2d at 1295.

■ Although Miscovich argues that "Shropshire's utter inattention to the Poorman claims for roughly half his lifetime, *i.e.,* 35 years" indicated that Shropshire abandoned the claims, Miscovich failed to demonstrate to the satisfaction of the trial court that Shropshire intended to abandon the claims. There is ample evidence in the record to support the trial court's finding that Miscovich failed to meet his burden of proving Shropshire's intent to abandon the claims.

Shropshire's testimony demonstrated that he had never intended to abandon the claims. When he left Alaska, Shropshire arranged, through the lease, to have Miscovich Brothers work the claims and perform the assessment work. Shropshire testified that, soon after he first left Alaska, he telephoned the recording office and verified that Miscovich Brothers was, in fact, doing the required assessment work; thereafter, he believed that Miscovich had continued to perform the annual assessments. Although Shropshire acknowledged that he received no royalties from the claim, he explained that he knew that mining the claims was not economically feasible during much of the lease period. According to Shropshire, the Miscovichs never told him that they were terminating the lease, and, in 1982, John Miscovich specifically advised him that Howard Miscovich had been working the claims over the years.

Given this evidence, the trial court's finding was not clearly erroneous.

### 3. *FLPMA.*

Miscovich also advances an argument based on the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701–84 (1988). Enacted in 1976, FLPMA required owners of unpatented federal mining claims to file certain instruments by October 21, 1979, and annually thereafter. Under FLPMA, failure to comply with the filing requirement constitutes abandonment.[2]

---

**2.** The FLPMA filing requirements to which Miscovich refers are found at 43 U.S.C. § 1744, which provides, in relevant part:

(a) **Filing requirements.** The owner of an unpatented lode or placer mining claim located prior to October 21, 1976 [the Act's enactment date] shall, within the three-year period follow-

Miscovich argues that Shropshire lost all right to the mining claims in 1979 by failing to comply with the filing requirements of FLPMA. According to Miscovich, Shropshire therefore had no remaining interest in the claims when he purported to terminate the Miscovich Brothers lease and to convey the claims to Tryck. Miscovich thus contends that he acquired ownership of the claims himself in 1989, when he staked and filed state location notices on the same land, in his own name, shortly after Tryck filed the quiet title action.

At trial, Tryck took the position that the assessment notices Miscovich had filed annually on the claims had substantially complied with the filing requirements of FLPMA, thereby preserving the claims. In resolving this issue, the trial court deferred to the federal Bureau of Land Management (BLM); the court stated that "[t]his question is one which is peculiarly within the agency's specialized field." BLM, in response to an inquiry from Miscovich's attorney, concluded that the claims had not been abandoned through noncompliance with FLPMA, stating that, "there is sufficient documentation in the mining claim recordation files to comply with the filing requirements of FLPMA." [3]

■ Given BLM's expertise regarding this issue, the trial court could properly rely on the agency's finding of compliance with FLPMA. BLM's determination appears to be well reasoned, and Miscovich has advanced no ground for rejecting it. Under the

circumstances, the trial court could properly find that Shropshire's Upper Poorman claims remained valid after the enactment of FLPMA.

Furthermore, even if Shropshire had lost the Upper Poorman claims through noncompliance with FLPMA, Tryck's right to title would not have been defeated by Miscovich's subsequent filing of state claims on the same land. As noted in the treatise, *American Law of Mining,*

> One who has contracted or agreed to perform annual assessment work on a claim cannot, by relocating it after his failure to do the work, acquire any interest adverse to that of the prior claimant. Courts have either held his location void, or held him to be trustee for the benefit of the prior locator.

2 *American Law of Mining,* § 38.03[4] (citing *Soule v. Johnson,* 34 Idaho 439, 201 P. 834 (1921); *O'Neill v. Otero,* 15 N.M. 707, 113 P. 614 (1910); *Argentine Mining Co. v. Benedict,* 18 Utah 183, 55 P. 559 (1898)).

■ Here, Shropshire leased the Upper Poorman claims to Miscovich Brothers in May 1955. The lease, by requiring Miscovich Brothers to "perform all the annual assessment work required to be done under law, during the term of th[e] lease," plainly imposed on Miscovich the duty of compliance with FLPMA once that statute became effective. Because any loss of interest Shropshire might have incurred due to noncompliance with FLPMA would have resulted from Mis-

---

ing October 21, 1976, and prior to December 31 of each year thereafter, file the instruments required by ... this subsection....

....

**(c) Failure to file as constituting abandonment; defective or untimely filing.** The failure to file such instruments as required by subsections (a) and (b) shall be deemed conclusively to constitute an abandonment of the mining claim or mill or tunnel site by the owner; but it shall not be considered a failure to file if the instrument is defective or not timely filed for record under other Federal laws permitting filing or recording thereof, or if the instrument is filed for record by or on behalf of some but not all of the owners of the mining claim or mill or tunnel site.

**(d) Validity of claims, waiver of assessment, etc., as unaffected.** Such recordation or application by itself shall not render valid any claim which would not be otherwise valid under ap-

plicable law. Nothing in this section shall be construed as a waiver of the assessment and other requirements of such law.

3. BLM's decisional letter stated, in relevant part:

[BLM's] records indicate that Affidavits of Annual Labor for the claims have been properly filed with BLM for each year since 1979, in compliance with the requirement of Section 314 of FLPMA. The "location notice" filing requirement under Section 314 of FLPMA has also been complied with....

....

This letter does not purport to determine right of ownership or possession of the disputed claims, but only that there is sufficient documentation in the mining claim recordation files to comply with the filing requirements of FLPMA.

covich Brothers' failure to perform its duties under the lease, Miscovich was barred from acquiring any interest adverse to Shropshire's on the same claims.

██ The same conclusion holds for the Lower Poorman claims, as to which Miscovich occupied the position of co-owner due to Shropshire's 1954 conveyance of a one-half interest to Miscovich Brothers. It is settled that "a relocation by one co-owner will inure to the benefit of all of the co-owners," and that "relocation [by a fiduciary] is held void as against the prior claimant." 2 *American Law of Mining*, § 38.03[1]–[3].

Under the circumstances, any title Miscovich obtained upon relocating state claims on the same land as the original federal claims would be deemed to be held in constructive trust for the original claimant, Shropshire, and for Shropshire's successor in interest, Tryck. 2 *American Law of Mining*, § 38.-03[1]–[4].

## C. Challenges to the Upper Poorman Claims

The trial court concluded that Tryck, as successor in interest to Shropshire, held full title to the Upper Poorman claims that Shropshire leased to Miscovich Brothers in 1955. Miscovich challenges this conclusion on two grounds.

### 1. Breach of the Lease

At trial, Miscovich contended that Shropshire's 1955 lease of the Upper Poorman claims to Miscovich Brothers terminated by its own terms when mining first became uneconomical and ceased in 1958. Thus, Shropshire had no valid interest in the Upper Poorman claims when he purported to terminate the Miscovich Brothers lease in 1987.

The trial court rejected this argument, finding that cessation of mining activity in 1958 did not terminate the lease, that the lease continued in effect until Shropshire notified Miscovich of its termination in 1987, and that Shropshire's notice of termination was justified, because Miscovich Brothers had continuously breached the lease "at least since 1981" by failing to pay royalties and not mining the claims in a minerlike manner.

██ Miscovich challenges these findings on appeal. He bases this challenge on the language of the lease, which provides that it would remain in effect "until said claims are worked out unless sooner forfeited through violation of any covenant hereinafter contained to be performed by [Miscovich Brothers]." Miscovich argues that, when Miscovich Brothers ceased mining the Upper Poorman claims in 1958 because the claims were no longer profitable, the claims were in effect "worked out."

In support of this argument, Miscovich cites *United States Smelting, Refining & Mining Co. v. Wigger*, 684 P.2d 850 (Alaska 1984). Miscovich's reliance on *Wigger* is misplaced. The lease in *Wigger* provided that it was to remain in effect "until all gold and other precious metals and minerals *recoverable in the sole opinion of the Lessee at a profit* shall have been recovered from the demised premises." *Id.* at 854 (emphasis added). Thus, the duration of the lease in *Wigger* expressly turned on the continued profitability of mining.

By contrast, as the trial court in the present case correctly recognized, the duration of the Miscovich Brothers lease hinged on exhaustion of gold from the claims, not on continued profitability. By its own terms the lease was to remain in effect—barring a breach of its covenants—until the Upper Poorman claims were "worked out." Although profitability did play a role in the covenants of the lease, that role related to Miscovich Brothers' duty to mine the claims actively, not to the duration of the lease. The lease covenants included the following: "That [Miscovich Brothers] will mine said claims in a workmanlike manner in accordance with approved mining methods and will work all ground that can be mined at a profit." The effect of this covenant was to exempt Miscovich Brothers from abiding by the duty of mining in a "workmanlike manner" during periods when the claims could not "be mined at a profit." Although making Miscovich Brothers' duty to mine the claims in a "workmanlike manner" contingent on profitability, this covenant had no effect on the duration of the lease; indeed, the provi-

sion assured that inactivity due to unprofitability could not be construed to violate the lease covenants.[4]

The undisputed evidence at trial established that Miscovich Brothers ceased mining in 1958 due to economic factors related to the price of gold, and not due to the claims being "worked out."[5] Under the circumstances, failure to continue active mining activities did not amount to a breach of the covenant of workmanlike mining and had no effect on the continued validity of lease. *Cf. Black Star Coal Corp. v. Napier,* 303 Ky. 778, 199 S.W.2d 449, 452 (Ky.App.1947); *Commercial Coal Mining Co. v. Big Bend Coal Mining Co.,* 293 Pa. 39, 141 A. 732, 734 (1928).

 Miscovich next argues that the superior court incorrectly found that Miscovich Brothers breached the lease covenants by failing to mine the claims in a workmanlike manner after 1981. However, testimony at trial established that although mining the Upper Poorman claims was not economically feasible for many years due to government control of gold prices, government restraints were relaxed in 1968 and by 1973 the price of gold was allowed to float freely on the open market. Testimony indicated that by 1979, the price of gold had increased fourfold from the previously fixed price of thirty-five dollars per ounce, and reached an astounding eight hundred dollars per ounce in the early 1980's. The increased price of gold made it possible to mine profitably in the Upper Poorman area once again. The superior court concluded that "workmanlike miners would have drilled the site since at least 1981." This factual finding is supported by the evidence and is not clearly erroneous.

It follows that the trial court correctly determined that Miscovich Brothers was in breach of the lease covenants beginning in at least 1981. Because the evidence further established that this breach continued throughout the remaining time that Miscovich held the lease, the trial court also properly determined that Shropshire had the right to terminate the lease in 1987.

### 2. *Waiver, Estoppel and Laches*

Miscovich also argues that, even if the trial court correctly found that the lease on the Upper Poorman claims remained valid in 1987 and that Miscovich Brothers' failure to mine the claims after 1981 amounted to a breach, the court should have concluded that Shropshire's effort to terminate the lease was barred by the doctrines of waiver, estoppel and/or laches. Miscovich maintains that invocation of these doctrines was justified by Shropshire's failure to take prompt action to enforce the lease covenants.

 Under Alaska law, waiver is generally defined as "the intentional relinquishment of a known right." *Milne v. Anderson,* 576 P.2d 109, 112 (Alaska 1978); *Arctic Contractors, Inc. v. State,* 564 P.2d 30, 40 (Alaska 1977). Waiver may be accomplished implicitly if the actor's conduct "evidences an intention to waive a right, or ... [if] neglect to insist upon the right results in prejudice to another party." *Milne,* 576 P.2d at 112. For an implied waiver to arise, however, "there must be direct, unequivocal conduct indicating a purpose to abandon or waive the legal right[.]" *Id.* Without knowledge of a right or claim, a party cannot be said to have

4. We note that the superior court found several factors indicating that Miscovich and Miscovich Brothers regarded the lease as continuing to be in effect as late as August 31, 1990: (1) when Miscovich returned to Poorman Creek in 1968, he did not re-stake the ground in his own name; (2) when contacted by Resource Associates regarding a proposed purchase of the land, Miscovich contacted Shropshire; and (3) in 1982, John Miscovich advised Shropshire that Miscovich had been mining the claims over the years. Although Miscovich Brothers' views concerning the continuing validity of the lease are not controlling or dispositive, *see Wigger,* 684 P.2d at 854–57 (concluding that parties' belief as to when lease terminated was not dispositive as to

when it actually terminated), they are nevertheless relevant and support the interpretation of the lease adopted by the trial court.

5. We recognize that in some situations, mining activities might be stopped due to a simultaneous depletion of resources and deterioration of economic conditions. In these situations, a genuinely difficult issue might arise as to whether a claim had been "worked out" or was simply unprofitable. The present case poses no such difficulty. The uncontroverted evidence at trial established that Miscovich Brothers stopped mining in 1958 due to the stagnant price of gold, which was then held by law at $35 an ounce.

waived it. *Nat'l Bank of Alaska v. J.B.L. & K. of Alaska, Inc.,* 546 P.2d 579, 587 (Alaska 1976). The issue of whether a waiver occurred involves a question of fact; a trial court's finding on the issue will be set aside on review only if clearly erroneous. *Fun Products Distributors, Inc. v. Martens,* 559 P.2d 1054, 1058 (Alaska 1977); Alaska R.Civ.P. 52(a).

The superior court found that Shropshire did not waive his right to terminate the lease based upon Miscovich Brothers' breach. The record indicates that Shropshire received information that Miscovich Brothers was working the mining claims as late as August 2, 1982, when John Miscovich told him that Miscovich had been working in Poorman "over the years." Thereafter, Shropshire had no occasion to learn of Miscovich's continuing breach until he spoke with Tryck in 1986. Under the circumstances, the trial court's finding that Shropshire's inaction did not constitute a waiver was not clearly erroneous.

Similarly, we find no error in the trial court's refusal to apply the doctrines of estoppel and laches to bar Shropshire's termination of the lease. Equitable estoppel "requires the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *Dressel v. Weeks,* 779 P.2d 324, 329 (Alaska 1989) (quoting *Jamison v. Consolidated Util., Inc.,* 576 P.2d 97, 102 (Alaska 1978)). The proponent of equitable estoppel bears the burden of proving each element. *See Dressel,* 779 P.2d at 329.

The trial court found that Miscovich failed to meet his burden of proof as to any of the requisite elements of equitable estoppel, because Miscovich adduced no evidence of representations by Shropshire that might have justified reasonable reliance, no evidence of actual reliance on the part of Miscovich, and no evidence of resulting prejudice. *See Jamison,* 576 P.2d at 102; *Arctic Contractors,* 564 P.2d at 40. The record discloses no basis for concluding that these findings are clearly erroneous, and Miscovich suggests none. We affirm the superior court's finding that equitable estoppel does not apply here.

The equitable defense of laches applies when the trial court finds unreasonable delay in the plaintiff's assertion of a claim and resulting prejudice to the defendant. *Wolff v. Arctic Bowl, Inc.,* 560 P.2d 758, 767 (Alaska 1977); *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough,* 527 P.2d 447, 457 (Alaska 1974). Both elements, unreasonable delay and prejudice, must be established before the defense is invoked. *Wolff,* 560 P.2d at 767; *Southern Pacific Co. v. Bogert,* 250 U.S. 483, 488–89, 39 S.Ct. 533, 535–36, 63 L.Ed. 1099 (1919). "The decision to sustain a defense based on laches is properly addressed to the discretion of the trial court, and will not be overturned unless we feel a definite and firm conviction that a mistake has been committed." *Pavlik v. State,* 637 P.2d 1045, 1047 (Alaska 1981).

The superior court found that Miscovich Brothers' breach occurred around 1981. The record indicates that Shropshire became aware of the breach in 1985 or 1986 and promptly terminated the lease in 1987. Tryck brought this action to quiet title in April 1989. The breach continued throughout this period, and Miscovich presented no evidence at trial to establish prejudice resulting from any delay. Under the circumstances, the record supports the superior court's findings that there was no lack of diligence or unreasonable delay in bringing the action, and that Miscovich suffered no prejudice during the time period 1982 to 1987. These findings are not clearly erroneous.

In sum, we affirm the trial court's refusal to apply waiver, estoppel, and laches to bar Shropshire's right to terminate the lease in 1987 based upon Miscovich Brothers' breach, and we conclude that the court properly awarded Tryck sole title to the Upper Poorman claims.

### D. Challenges to the Lower Poorman Claims

The trial court found that the half interest Shropshire retained in the Lower Poorman claims after deeding Miscovich Brothers an undivided one-half interest in 1954 remained valid when Shropshire quitclaimed the claims

to Tryck in 1987. The court additionally found that, because brothers John and George Miscovich conveyed their partnership share of Miscovich Brothers' interest in the Lower Poorman claims to Howard Miscovich in 1983, Howard was entitled to three-quarters of Miscovich Brothers' one-half interest (or three-eighths of the total interest); and because Andrew Miscovich had retained his original partnership interest in the claims, the court found that he was entitled to one-quarter of the Miscovich Brothers' half interest (or one-eighth of the total).

On appeal, Miscovich disputes the awards to both Tryck and Andrew Miscovich.

### 1. *Tryck's Interest*

It is undisputed that, in 1976, the Lower Poorman federal claims were technically "lost" by a federal conveyance to the state of the land on which the claims were located. In conveying the land to the state, the federal government neglected to except the Lower Poorman claims. Upon conveyance to the state, the unexcepted federal mining claims were extinguished, and the land became open for anyone to stake new mining claims under state law.

Because the Lower Poorman claims were thus "lost" in 1976, Miscovich maintains that the superior court should not have awarded Tryck any interest in them. Miscovich further argues that when he staked and located the claims under state law in 1987, he acquired sole ownership rights in the Lower Poorman state claims.

 As a co-owner of the claims with Shropshire, however, Miscovich Brothers— and Miscovich, as a partner in Miscovich Brothers—were barred as a matter of law from using the loss of the federal claims to gain an advantage over Shropshire. It is well established that the co-owners of a claim owe a continuing fiduciary duty to each other regarding the claim, even if the original claim becomes void:

Co-owners stand in a relation of mutual trust and confidence to each other. No co-owner will be permitted to act hostilely toward another in regard to their common property, and any distinct title acquired by one will inure to the benefit of all.

The body of law applicable to co-owners generally applies with equal force to co-owners of a mining claim. Therefore, a relocation by one co-owner will inure to the benefit of all of the co-owners. . . .

*Even when an original location is void, the would-be co-locators are treated as fiduciaries so as to place on each an equitable duty not to act for the benefit of himself to the detriment of the others.*

2 *American Law of Mining*, § 38.03[1] (emphasis added) (citations omitted).

When the claims were lost in the federal conveyance to the state, Miscovich owed a continuing fiduciary duty to his brothers and to Shropshire regarding the Lower Poorman claims. Consequently, as the trial court correctly concluded, Miscovich's filing of state claims under the name Miscovich Mining in 1987 must be deemed to have been an act taken for the benefit of all co-owners. The state claims acquired by him inured to the co-owners of the federal claims, Miscovich Brothers and Shropshire. The trial court did not err in awarding a one-half share in the Lower Poorman claims to Tryck.

### 2. *Andrew Miscovich's Interest*

Howard Miscovich also appeals the superior court's award of a one-eighth interest in the Lower Poorman claims to his brother Andrew based on their partnership interests in Miscovich Brothers. He claims that his and Andrew's respective interests in the Miscovich Brothers partnership were not properly before the court. Thus, he contends that the trial court erred in dividing his and Andrew's respective interests in the partnership's one-half share of the Lower Poorman claims.[6]

**6.** Howard Miscovich notes that this issue is significant not only in regard to this case, but also in regard to other potential cases involving Howard Miscovich's and Andrew Miscovich's respective interests in Miscovich Brothers. Given that Andrew has already asserted collateral estoppel

and res judicata against Howard regarding this issue in another case currently pending, *Flat Creek Mining Co. v. Howard Miscovich, et. al.*, Case No. 4FA–91–1631–CI, Howard's concerns are not merely hypothetical in nature.

■ Miscovich correctly notes that the trial court may not adjudicate issues not raised before or during trial and unsupported by the record. *Curran v. Mount,* 657 P.2d 389, 392 (Alaska 1982). Miscovich appears to be mistaken, however, in claiming that the determination of his and Andrew's respective interests in the Lower Poorman claims was not an issue properly before the court in the context of Tryck's quiet title action. An action to quiet title "is not aimed at a particular instrument, but rather at the pretensions of all individuals claiming adversely. Inquiry is permitted into the whole title of the property in question, the purpose being to enable the plaintiff to quiet his title as against unfounded claims of all nature." *Davis v. Tant,* 361 P.2d 763, 765–66 (Alaska 1961).

■ Nevertheless, the record in this case establishes that Howard Miscovich's and Andrew Miscovich's interests in the Lower Poorman claims were held by them as partners in Miscovich Brothers. The 1954 deed from Shropshire conveyed an undivided one-half interest in the claims to the Miscovich Brothers partnership, not to its individual partners. In 1983, brothers George and John Miscovich conveyed to Howard their partnership share in the claims, while Andrew Miscovich retained his share. The trial record, however, is devoid of any evidence supporting the conclusion that the Miscovich Brothers partnership was dissolved or that the Lower Poorman claims were withdrawn from the assets of the partnership.

From the record it appears that, at the time of trial, Howard and Andrew Miscovich continued to hold their respective interests in the Lower Poorman claims as partners of Miscovich Brothers and that title to the undivided one-half interest conveyed by Shropshire in 1954 remained in Miscovich Brothers. Under the circumstances, title should properly have issued to Miscovich Brothers for its one-half interest in the partnership claims. For this reason, we conclude that the trial court erred in ordering title issued to Howard and Andrew Miscovich individual-

ly in proportion to their partnership interests in the claims.

### E. *Attorney's Fees and Costs*

■ Lastly, Howard Miscovich appeals the superior court's award of $2,300 in aerial photography expenses and $1,900 in deposition costs, including $535 for copying, to Tryck. However, Miscovich has failed to designate for the record on appeal the superior court's decision on costs as well as a number of other documents relevant to this issue. Under Appellate Rule 210(d), this court considers nothing but the designated record on appeal. It is well established that a party's failure to designate portions of the record that are necessary to allow the determination of a point on appeal will amount to a waiver or abandonment of that point. *L.E. Spitzer Co. v. Barron,* 581 P.2d 213, 218 (Alaska 1978); *Fairbanks v. Schaible,* 375 P.2d 201, 211 (Alaska 1962); *McBride v. State,* 368 P.2d 925, 929 (Alaska 1962), *cert. denied,* 374 U.S. 811, 83 S.Ct. 1702, 10 L.Ed.2d 1035 (1963).

Here, Miscovich relies on *CTA Architects v. Active Erectors & Installers, Inc.,* 781 P.2d 1364, 1366 (Alaska 1989), to challenge the trial court's award of fees and costs to Tryck, particularly the award for aerial photography expenses. The propriety of the award, however, cannot definitively be resolved in the absence of those portions of the trial record that elucidate the basis of the trial court's ruling. *Cf. CTA Architects,* 781 P.2d at 1367 (Rabinowitz, J., concurring) ("[I]n certain cases it will be within the trial court's discretion to allow full exhibit preparation costs under Civil Rule 79(b)[.]").

Because Miscovich has failed to provide this court with an adequate record to decide the point, we affirm the superior court on the issue of attorney's fees and costs.

### III. CONCLUSION

We AFFIRM the superior court's award of the entire Upper Poorman claims and a one-half interest in the Lower Poorman claims to Keith Tryck. We REVERSE the court's determination awarding a three-eighths

share and a one-eighth share in the Lower Poorman claims to Howard Miscovich and Andrew Miscovich individually and RE-MAND for amendment of the judgment consistent with this opinion. Finally, we AF-FIRM the superior court's award of attorneys fees and costs.